Katherine HUMPHREYS, Secretary, Indiana Family & Social Services Administration, Appellant (Defendant below),

v.

CLINIC FOR WOMEN, INC., Women's Pavilion, Inc., Ulrich G. Klopfer, D.O., and Martin Haskell, M.D., Appellees (Plaintiffs below).

No. 49S00–0011–CV–714.

Supreme Court of Indiana.

Sept. 24, 2003.

Steve Carter, Attorney General of Indiana, Thomas M. Fisher, Special Counsel, Office of Attorney General, Indianapolis, IN, Attorneys for Appellant.

Mary Hoeller, Indianapolis, IN, Bebe J. Anderson, Bridgitte Amiri, New York, NY, Attorneys for Appellee.

Bruce A. Stuard, Elwood, IN, Paul Benjamin Linton, Northbrook, IL, James Bopp Jr., Richard Coleson, Terre Haute, IN, Attorneys for Amici Curiae Members of the Indiana Legislature, Indiana Right to Life Committee, Inc.

Kenneth J. Falk, Jacquelyn Bowie Suess, Indianapolis, IN, Attorneys for Amicus Curiae Indiana Civil Liberties Union, Inc.

SULLIVAN, Justice.

Indiana's Medicaid program will pay for a poor woman to have an abortion but only if necessary to preserve her life or if rape or incest caused her pregnancy. The plaintiffs in this case argue, and the trial court held, that Medicaid must pay for any abortion that is medically necessary, citing the Indiana Constitution's requirement that privileges or immunities cannot be granted to a citizen or class of citizens that do not equally belong to all citizens on the same terms.

For the reasons set forth in this opinion in part I under "Discussion," I believe that this provision of the Indiana Constitution does not require Medicaid to pay for all abortions that are medically necessary.

Chief Justice Shepard and Justice Dickson join in this part of this opinion.

However, for the reasons set forth in this opinion in part II under "Discussion," I also conclude that, so long as the Indiana Medicaid program pays for abortions to preserve the lives of pregnant women and where rape or incest cause pregnancy, it must also pay for abortions in cases of pregnancies that create for pregnant women serious risk of substantial and irreversible impairment of a major bodily function. Justices Boehm and Rucker join in this part of this opinion.

### Background

In 1965, Congress established the Medicaid program, a joint federal-state program that pays for some health care costs of low-income people, by amending Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v. Under the Medicaid program, the federal government reimburses participating states for the health care services provided pursuant to the state's medical assistance or Medicaid plan. *Id.* at §§ 1396a(a)(10), 1396d(a). States are not required to participate in the Medicaid program but states that choose to participate must conform their Medicaid program to federal Medicaid law. *Id.* at § 1396a(a).

In 1973, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment protected, to a certain extent, the freedom of a woman to terminate a pregnancy. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

In 1976, Congress first adopted legislation, referred to as the "Hyde Amendment" for its author, Representative Henry J. Hyde, that prohibits the federal government from reimbursing states under the Medicaid program for abortions except where a woman would be placed "in danger of death unless an abortion is performed" or where "the pregnancy is the result of an act of rape or incest." Pub.L. No. 106–113, §§ 508–509, 113 Stat. 1501, 1501A–274 (1999). Although the provisions of the Hyde Amendment have varied from time to time, this is the language of the prohibition and exception in effect today.[1]

---

1. The Hyde Amendment has never had the status of permanent law but instead has been attached annually to legislation appropriating funds for certain departments of the federal government for a given fiscal year or has been adopted as a stand-alone joint resolution. The full version of the Hyde Amendment in effect on the date this lawsuit was filed states:

"Sec. 508. (a) None of the funds appropriated under this Act, and none of the funds in any trust funds are appropriated under this Act shall be expended for any abortion.

(b) None of the funds appropriated under this Act, and none of the funds in any trust fund to which funds are appropriated under this Act, shall be expended for health benefits coverage that includes coverage of abortion.

(c) The term "health benefits coverage" means the package of services covered by a managed care provider or organization pursuant to a contract or other arrangement.

Sec. 509 (a) The limitations established in the preceding section shall not apply to an abortion

(1) if the pregnancy is the result of an act of rape or incest; or

(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.

(b) Nothing in the preceding section shall be construed as prohibiting the expenditure by a State, locality, entity, or private person of State, local, or private funds (other than a State's or locality's contribution of Medicaid matching funds).

(c) Nothing in the preceding section shall be construed as restricting the ability of any managed care provider from offering abortion coverage or the ability of a State or locality to contract separately with such a provider for such coverage with State funds (other than a State's or locality's contribution of Medicaid matching funds)." Consolidated Appropriations Act of 2000, Pub.L. No. 106–113,

In 1977, the Supreme Court held that the constitutional right to abortion recognized in *Roe v. Wade* did not include an entitlement to Medicaid payments that were not medically necessary. *Maher v. Roe*, 432 U.S. 464, 470, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). In 1980, the Supreme Court was faced with a challenge to the constitutionality of the Hyde Amendment, *i.e.*, whether Congress could prohibit the use of federal Medicaid funds to reimburse states for medically necessary abortions. The court held that the Hyde Amendment did not violate either the Due Process or the Equal Protection Clauses of the Fourteenth Amendment. *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

Any state that participates in the Medicaid program must cover those abortions for which federal funds are available. *Zbaraz v. Quern*, 596 F.2d 196, 201 (7th Cir.1979), *cert. denied*, 448 U.S. 907, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). Nevertheless, "[a] participating state is free, if it so chooses, to include in its Medicaid plan those medically necessary abortions for which federal reimbursement is unavailable . . ." *Harris*, 448 U.S. at 309, 100 S.Ct. 2671.

Indiana participates in the federal Medicaid program and is bound by all of its requirements. Ind.Code § 12–15–1–1. The Indiana Medicaid program provides low-income Hoosier citizens with virtually all non-experimental, medically necessary health care, including some services for which federal reimbursement is not available. *See e.g.*, Ind.Code § 12–15–5–1(18) (providing coverage for nonmedical nursing care given in accordance with tenants and practices of a recognized church); *cf.* 42 C.F.R. § 440.170(b) (restricting federal funding for such institutions to those organized pursuant to Section 501(c)(3) of the Internal Revenue Code). Indiana Medicaid covers inpatient hospital services, physicians' services, and outpatient hospital or clinic services for all recipients and provides a full range of reproductive health care for Medicaid-eligible men. Ind.Code § 12–15–5–1. Covered services must be "medically reasonable and necessary" and are required to be provided to Medicaid recipients in a uniformly equitable manner. Ind.Code § 12–15–1–10. Indiana Medicaid defines a "medically reasonable and necessary service" as one that "meets current professional standards commonly held to be applicable to the case." Ind. Admin. Code tit. 405, r. 5–2–17 (2001). However, in the case of abortion services, the program defines an abortion as necessary (and therefore covered under the program) only if "performed to preserve the life of the pregnant woman or in other circumstances if the abortion is required to be covered by Medicaid under federal law," *e.g.*, where the pregnancy was caused by rape or incest. Ind.Code § 12–15–5–1(17);[2] Ind.Code § 16–34–1–2;[3] Ind. Admin. Code tit. 405, r. 5–28–7.[4]

§§ 508–509, 113 Stat. 1501, 1501A–274 (1999).

2. "Except as provided in IC 12–15–2–12, IC 12–15–6, and IC 12–15–21, the following services and supplies are provided under Medicaid: (17) Family planning services except the performance of abortions." Ind.Code § 12–15–5–1.

3. "Neither the state nor any political subdivision of the state may make a payment from any fund under its control for the performance of an abortion unless the abortion is necessary to preserve the life of the pregnant woman." Ind.Code § 16–34–1–2.

4. "Medicaid reimbursement is available for abortions only if performed to preserve the life of the pregnant woman or in other circumstances if the abortion is required to be covered by Medicaid under federal law. Termination of an ectopic pregnancy is not considered an abortion. All appropriate docu-

The plaintiffs in this case, Clinic for Women, Inc., Women's Pavilion, Inc., Ulrich G. Klopfer, D.O., and Martin Haskell, M.D., challenge the constitutionality of these two statutes and this regulation. The plaintiffs contend that the statutes' and regulation's collective prohibition on the use of state Medicaid funds to pay for abortions violates the Equal Privileges and Immunities Clause of Art. I, § 23, as well as Art I, §§ 1 and 12, of the Indiana Constitution.[5]

After hearing oral argument of the parties, the trial court granted the plaintiff's motion for summary judgment and denied the state's cross-motion for summary judgment, ruling that the challenged statutes and regulation violated Art. I, § 23. The trial court did not address plaintiffs' Art. I, § 1 and 12, claims and they are not before us here.

Article I, § 23, of the Indiana Constitution reads as follows:

> The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.

From at least 1971 until about nine years ago, this court analyzed claims under the state Equal Privileges and Immunities Clause using the same techniques as those employed by the United States Supreme Court to analyze claims under the Equal Protection Clause of the Fourteenth Amendment. *See Collins v. Day,* 644 N.E.2d 72, 75 (Ind.1994). In *Collins,* this court jettisoned the use of federal equal protection analytical methodology to claims alleging violations of Art. I, § 23, and held that such claims should be analyzed using a different standard. *Id.* That standard was summarized as follows:

> Article 1, Section 23 of the Indiana Constitution imposes two requirements upon statutes that grant unequal privileges or immunities to differing classes of persons. First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

*Id.* at 80. Indiana courts have made frequent use of the *Collins* standard since its promulgation, including the trial court here.

The trial court found that the ban on funding abortions contained in the challenged statutes and regulation failed both prongs of the *Collins* standard summarized *supra.*

The first prong of the Collins test requires that "where the Legislature singles

---

mentation must be attached to the claim and to claims for directly related services before reimbursement shall be made." Ind. Admin. Code tit. 405, r. 5–28–7 (2001).

**5.** "We declare, that all people are created equal; that they are endowed by their creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and

well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government." Art. I, § 1.

"All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay." Art. I, § 12.

out one person or class of persons to receive a privilege or immunity not equally provided to others, such classification must be based upon distinctive, inherent characteristics which rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislation must be reasonably related to such distinguishing characteristics." *Id.* at 78–79. The trial court started its analysis of this prong with the proposition that the "Medicaid program is a government program through which a benefit—government payment for medically necessary treatment—is provided to indigent Hoosiers." (Supp. R. 8.) "However," the trial court continued, "that benefit is not provided equally to all indigent Hoosiers—women who, for medical reasons, need to terminate their pregnancy in order to preserve and protect their health did not receive that funding benefit. Under the Indiana Medicaid program, indigent men and indigent pregnant women who need treatment (other than abortion) which is medically necessary to preserve their health are singled out for a benefit which is denied to indigent pregnant women needing to terminate their pregnancy to preserve and protect their health." (Supp. R. 8.)

The second prong of the *Collins* analysis requires that the preferential treatment "be uniformly applicable and equally available to all persons similarly situated." *Collins,* 644 N.E.2d at 80. Here the trial court found that "[a]ll Medicaid-eligible pregnant women are similarly situated in that all may require, from time to time, an array of medically necessary treatment to protect and preserve their health." But, under the challenged Medicaid statutes and regulations, "Medicaid coverage of needed medical services is not 'uniformly applicable and equally available' to those similarly situated. Pregnant women who require a medically necessary abortion to preserve their health will not receive state funding while pregnant women who require other types of medically necessary treatment will receive state funding." (Supp. R. 9.)

Under *Collins,* legislative discretion is accorded substantial deference. *Collins,* 644 N.E.2d at 80–81. The trial court identified the State's interests claimed to be served by the challenged statutes and regulation as potential life, administrative simplicity, and cost containment. But it found these justifications insufficient.

[P]ursuing the goal of promoting fetal life at the expense of preserving the health of women who need to terminate their pregnancy for medical reasons contravenes the purpose of the Medicaid program, which is designed to enable indigent Hoosiers to obtain medically necessary treatment. The State's asserted interest in administrative simplicity and cost containment also do not justify the funding ban. First, the goal of achieving administrative simplicity in itself can never serve as a sufficient goal to justify depriving some citizens of privileges accorded others. Second, the goal of cost containment is also not reasonably related to the funding ban. Abortions are less expensive than the costs associated with childbirth. Moreover, preventing a Medicaid-eligible woman from terminating her pregnancy to protect and preserve her health will necessarily mean that she will have increased health problems that the Indiana Medicaid program must cover. Cost containment is not served by the funding ban and cannot be the basis to depriving some citizens of a privilege accorded others.

(Supp. R. 10.)

The State appealed the judgment directly to our Court pursuant to Ind. Appellate

Rule 4(A)(1)(b).[6]

Our Court has been informed in this matter by a substantial number of decisions from sister courts on similar claims under their respective state constitutions, including some with constitutional provisions the same as our Equal Privileges and Immunities Clause. Many of these are identified and discussed in an excellent law journal article, Melanie D. Price, *The Privacy Paradox: The Divergent Paths of the United States Supreme Court and State courts on the Issue of Sexuality*, 33 Ind. L.Rev. 863, 875–879 (2000).

The Court also appreciates the assistance of amicus curiae Indiana Civil Liberties Union, Inc., Indiana Right to Life Committee, Inc., and twelve members of the Indiana General Assembly (Senators Frank Mrvan, Jr., Kent Adams, David C. Ford, Allie V. Craycraft, Jr., and R. Michael Young, and Representatives Gary L. Cook, Jeffrey A. Thompson, P. Eric Turner, James Russell Buck, Dennis K. Kruse, and Jerry L. Denbo), and their respective counsel.

### Discussion

### I

The Equal Privileges and Immunities Clause of Art. I, § 23, of the Indiana Constitution states, "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens."

> Article I, Section 23 of the Indiana Constitution imposes two requirements upon statutes that grant unequal privileges or immunities to differing classes of persons. First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all person similarly situated.

*Collins*, 644 N.E.2d at 80. In determining whether a statute complies with or violates this provision, the Court shows substantial deference to the discretion of the Legislature in attempting to "balance the competing interest involved," and the Legislature's basis in creating the distinction. *Id.* To resolve conflicts between the state constitution and a challenged statute, this Court has stated that "the better course is to construe or reconstrue the statute in such a way as to further the purpose of the legislature without offending the Indiana Constitution." *Van Dusen v. Stotts*, 712 N.E.2d 491, 496 (Ind.1999).

Under the first prong of the *Collins* test, any "disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes." *Collins*, 644 N.E.2d at 80.

> Where the legislature singles out one person or class of persons to receive a privilege or immunity not equally provided to others, such classification must be based upon distinctive, inherent characteristics which rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislation must be reasonably related to such distinguishing characteristics.

*Id.* at 78–79.

Before we can determine whether the legislative classification under the first prong of *Collins* is permissible, we need to identify the legislative classification at issue. The parties here define the relevant

---

**6.** "The Supreme Court shall have mandatory and exclusive jurisdiction over the following cases: ... Appeals of Final Judgments declaring a state or federal statute unconstitutional in whole or in part." Ind. Appellate Rule 4(A)(1)(b).

classification differently. The plaintiffs contend (and the trial court agreed) that the legislative classification at issue places (1) "indigent men and indigent women who need treatment (other than abortion) which is medically necessary to preserve their health" into a class for which the necessary treatment is provided, and (2) "indigent pregnant women needing to terminate their pregnancy to preserve and protect their health" into a class for which the necessary treatment is not provided. (Supp. R. 8.) The State argues that the relevant classification is between (1) "medically necessary services and supplies" for which federal Medicaid reimbursement at some level is available (a class that includes abortions to save a woman's life and where pregnancy resulted from rape or incest) and (2) medically necessary services and supplies for which it is not (a class that includes all other medically necessary abortions). Br. of Appellants at 14.

In *McIntosh v. Melroe Co.,* Justice Boehm examined the way in which the legislative classification at issue in the first prong of *Collins* is to be determined:

> Although *Collins* itself uses the word "inherent" to describe the characteristic that defines the class, this cannot be equated with "innate" characteristics of members of the class. The worker's compensation scheme [the statute at issue in *Collins*], like the Product Liability Act [the statute at issue in *McIntosh*], turns on the characteristics of the employers, not the injured workers. Similarly, under the Product Liability Act, everyone may potentially recover for an injury from a product not yet ten years old, and everyone injured from an older product is barred. It is the claim, not any innate characteristic of the person, that defines the class.

729 N.E.2d 972, 981 (Ind.2000). We think the claim here, reduced to its essentials, is that some Medicaid-eligible pregnant women in Indiana are entitled to Medicaid-financed medically necessary abortions and others are not. We think this "claim ... defines the class:" (1) Medicaid-eligible pregnant women who seek to terminate their pregnancies in order to preserve their lives or where their pregnancies resulted from rape or incest are in a class where Medicaid pays for their abortions; and (2) Medicaid-eligible pregnant women who seek to terminate their pregnancies for any other medically necessary reason are in a class where Medicaid will not pay for their abortions. Although this formulation of the classification at issue differs somewhat from those advanced by the parties, we believe it sufficiently similar to each that their arguments against and in favor of the classifications retain their full force.

As already discussed, in analyzing the constitutional permissibility of the classification identified, we "accord considerable deference to the manner in which the legislature has balanced the competing interest involved." *Collins,* 644 N.E.2d at 80 (citing *Johnson v. St. Vincent Hosp.,* 273 Ind. 374, 404–05, 404 N.E.2d 585, 604 (1980)). Indeed, we frequently recite that the challenger to the constitutionality of the legislative scheme bears the burden "to negative every conceivable basis which might have supported the classification." *Johnson,* 273 Ind. at 392, 404 N.E.2d at 597. In *Collins,* we quoted from an earlier opinion of this Court in this regard:

> Legislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable. So long as the classification is based upon substantial distinctions with reference to the subject matter, we will not substitute our judgment for that of the legislature; nor will we inquire into

the legislative motives prompting such classification.

*Collins,* 644 N.E.2d at 80 (quoting *Chaffin v. Nicosia,* 261 Ind. 698, 701, 310 N.E.2d 867, 869 (1974)).

The plaintiffs contend that even this deferential standard of review is violated by the statutory and regulatory scheme challenged here. Calling the classification "manifestly unreasonable," Br. of Appellees at 21, they argue that the

> ... classes of persons granted and denied the privilege are inherently the same in ways that relate directly to the subject matter of the Medicaid legislation: they are low-income, such that they meet the Medicaid eligibility requirements, and they seek medical care for which they have a medical need. What distinguishes between the two is that the members of the group denied the privilege have health conditions which cause them to need an abortion to preserve their health, while members of the class granted the privilege have health conditions which cause them to need medical care other than abortion to preserve their health. However, that difference does not relate to the subject matter of the Medicaid statutes. In fact, denying funding to a woman whose health will deteriorate if she does not have an abortion runs directly counter to the subject matter of the legislation.

*Id.* at 19.

The State offers four justifications for the classification.

First, the State argues that the unavailability of federal financial participation means that it would not be "fiscally prudent and rational" and that it would otherwise be "administrative[ly] inconvenien[t]" for the State to pay for abortions that are not eligible for federal reimbursement. Br. of Appellants at 14, 15.

Second, the State argues that it has a "valid and compelling" interest in protecting fetal life, quoting from this court's decision in *Cheaney v. State,* 259 Ind. 138, 147, 285 N.E.2d 265, 270 (1972), *cert. denied,* 410 U.S. 991, 93 S.Ct. 1516, 36 L.Ed.2d 189 (1973).[7] The State quotes from *Harris v. McRae* for support in pressing its point that "limiting government funding for abortion is a rational means for indicating the government's interest in protecting fetal life." Br. of Appellants at 17 (*quoting Harris,* 448 U.S. at 325, 100 S.Ct. 2671).

Third, in addition to the fiscal and administrative efficiency dimensions of the federal funding argument made *supra,* the State advances additional fiscal and administrative justifications for the classification. It argues that a more liberal system of government payments for abortion "will result in more of that activity" and "may have a dramatic impact on the State's future tax base." Its broader point here is that the allocation of Medicaid spending is a fiscal policy determination for the legislative and executive branches. Br. of Appellants at 18–19.

The plaintiffs respond that the State should not be entitled to offer justifications for the classification extraneous to the purpose of the Medicaid program itself. "If the State's position is accepted, the Legislature could insulate any discriminatory statute from constitutional challenge by simply claiming that it serves multiple purposes. Thus, the State could withhold any and all government benefits from women who have had abortions, irrespective of the

---

7. *Cheaney v. State,* decided about six months prior to *Roe v. Wade,* rejected (over the dissent of Justice DeBruler) a federal constitutional challenge to Indiana's criminal abortion statute.

subject matter or goal of the statute at issue. For example, the State could grant free tuition to state universities to all its citizens except for those who have had an abortion, on the grounds that the statute furthers the State's interest in protecting fetal life." Br. of Appellees at 21.

We appreciate the point plaintiffs make but think it only has force if our determination is binary. To the contrary, *Collins,* its precursors, and its progeny all indicate that we look at the Legislature's "balancing of the competing interest involved." *See American Legion Post No. 113 v. State,* 656 N.E.2d 1190, 1192 (Ind.Ct.App. 1995) (*citing Collins,* 644 N.E.2d at 80 (*citing Johnson,* 273 Ind. at 404–05, 404 N.E.2d at 604)), *trans. denied.*

In balancing the interests here, we have given careful attention to the evidence presented by the plaintiffs in the trial court demonstrating a number of different health risks faced by pregnant women with respect to which an abortion is medically necessary. In support of their motion for summary judgment, the plaintiffs submitted the affidavit of Dr. Jane Hodgson, a physician specializing in obstetrics and gynecology and an expert in the field. Dr. Hodgson testified that many women confront serious health risk when pregnant. Hypertension complicates about 8–10% of pregnancies. Hypertensive pregnant women are at a higher risk for cerebrovascular accidents (strokes), abruptio placentae (premature separation of the placenta from the uterus), and disseminated intravascular coagulation (a severe bleeding disorder). Dr. Hodgson further testified that pregnancy-induced diabetes occurs in approximately 1–3% of pregnancies. Women with preexisting diabetes have ten times the risk of pregnancy-related death than do non-diabetic women. Diabetes-associated retinopathy (eye disease) or nephropathy (kidney disease) often worsen significantly during pregnancy. Dr. Hodgson added that pregnancy jeopardizes the health of a woman with advanced coronary artery disease or severe impairment of the heart valve, and all pregnant women with heart disease have a higher risk of congestive heart failure, cardiac infections, and arrhythmia (abnormal heart rhythms). The health of a pregnant woman is seriously impaired when she suffers from chronic renal failure, myasthenia gravis, or pulmonary embolism from a previous pregnancy. Pregnant women with lupus may experience aggravation of their disease.

Dr. Hodgson also testified that pregnant women with sickle cell anemia experience more frequent and more severe crises, especially in bones, infections such as pneumonia and urinary tract infections, increasingly severe anemia, congestive heart failure, and pulmonary complications such as embolus. Other conditions exacerbated by pregnancy include asthma, arthritis, inflammatory bowel disease, gall bladder disease, liver disease, and epilepsy. Dr. Hodgson added that when cancer threatens a pregnant woman's life, the pregnancy puts further strain on the woman's health, and may require a suspension of cancer treatment because of harm to the fetus from such treatments. Thus, if treatment of the disease requires radiation or chemotherapy, a choice must be made between the health of the patient and the fetus, since these forms of therapy are likely to result in fetal malformation or death. Pregnancy may accelerate the condition of women with malignant breast tumors that are estrogen receptor positive. Dr. Hodgson's testimony was bolstered by the other affidavits submitted by the plaintiffs from Dr. Judith Belsky and Dr. William Mudd Haskell.

The question for this Court is whether the Legislature may prohibit the State from paying for an abortion for a

Medicaid-eligible pregnant woman facing any of these health risks while at the same time it authorizes the State to pay for an abortion to preserve the life of a Medicaid-eligible pregnant woman or where the pregnancy was caused by rape or incest. We find the State's justifications of unavailability of federal financial participation, interest in protecting fetal life, fiscal policy, and administrative efficiency sufficient to sustain the constitutionality of the classification under the first prong of the *Collins* test. We are in no position to deny plaintiffs' argument that the statutes and regulation at issue impose significant financial, physical, and emotional hardship on many low-income Hoosier women. But we hold that the State's justifications for the classification do not rise to the level of being "arbitrary or manifestly unreasonable." *Collins,* 644 N.E.2d at 80 (*quoting Chaffin,* 261 Ind. at 701, 310 N.E.2d at 869).

The second prong of the *Collins* test requires that the "privileged" legislative classification "be open to any and all persons who share the inherent characteristics which distinguish and justify the classification, with the special treatment accorded to any particular classification extended equally to all such persons." *Collins,* 644 N.E.2d at 79.

The trial court found this aspect of *Collins* violated because "[p]regnant women who require a medically necessary abortion to preserve their health will not receive state funding while those who require other types of medically necessary treatment will receive state funding." (Supp. R. 9.) We believe the State is correct when it responds that, because the plaintiffs "challenge not the provision of Medicaid benefits to indigent people gen-

erally, but rather the deprivation of Medicaid benefits to some who seek abortions, it is clearer to frame the issue as whether that deprivation is uniformly applicable to all who share the inherent characteristics that justify the classification." Brief of Appellants at 23. We find the requirement of the second prong of *Collins* met because Medicaid will pay for abortions for all persons in the classification of Medicaid eligible pregnant women seeking to terminate their pregnancies to preserve their life or where the pregnancy resulted from rape or incest.

## II

A statute that is constitutional on its face may be unconstitutional as applied to a particular plaintiff. *See Martin v. Richey,* 711 N.E.2d 1273, 1284–85 (Ind. 1999) (holding Indiana Medical Malpractice Act statute of limitations constitutional on its face but unconstitutional as applied to plaintiffs whose medical condition and the nature of the asserted malpractice make it unreasonable to expect that they could discover the asserted malpractice and resulting injury within the limitations period); *City of Fort Wayne v. Cameron,* 267 Ind. 329, 334, 370 N.E.2d 338, 341 (1977) (holding Indiana Tort Claims Act notice requirement constitutional on its face but unconstitutional as applied to plaintiffs whose mental and physical incapacity render them unable to comply with the notice requirement). For the reasons set forth below, we believe that the statute and regulations challenged here are unconstitutional as applied to Medicaid-eligible pregnant women whose pregnancies "create serious risk of substantial and irreversible impairment of a major bodily function." [8]

---

**8.** The quoted language is from Ind.Code § 16–18–2–223.5 (1998), the State abortion

control statute, discussed *infra.*

Article I, § 23, of our Constitution prohibits a statute from providing disparate treatment to different classes of persons if the disparate treatment is not reasonably related to inherent characteristics that distinguish the unequally treated classes. *McIntosh,* 729 N.E.2d at 981; *Martin,* 711 N.E.2d at 1280; *Collins,* 644 N.E.2d at 80. We believe that the characteristics that distinguish Medicaid-eligible pregnant women whose pregnancies create serious risk of substantial and irreversible impairment of a major bodily function to be virtually indistinguishable from the characteristics of women for whose abortions the State does pay. To the extent there is a distinction, it is too insubstantial to be sustained by the State's justifications.

The challenged statutory and regulatory scheme here provides disparate treatment to different classes of persons: Medicaid (1) will pay for abortions where necessary to preserve the life of the pregnant woman or where the pregnancy was caused by rape or incest but (2) will not pay for any other abortions. Thus the Constitution requires that the disparate treatment be reasonably related to inherent characteristics that distinguish the "preserve the life, rape, or incest" classification from the "any other abortions" classification. Within this "any other abortions" classification is a subset consisting of abortions where the pregnancies create for Medicaid-eligible women a serious risk of substantial and irreversible impairment of a major bodily function.

The State's argument is that there are "inherent characteristics ... reasonably related to permissible legislative goals" that justify Medicaid-funded abortions where necessary to preserve the life of the pregnant woman or where the pregnancy was caused by rape or incest. Br. of Appellants at 17. This is because "[a]bortions in those circumstances raise problems and concerns that abortions in other circumstances do not." *Id.* Although it does not elaborate, the State says that these problems are the result of certain "medical, moral, social, and ethical concerns" that "do not arise in other abortion cases." *Id.* at 18.

That is, the State says that providing Medicaid-financed abortions is reasonably related to the "inherent characteristics" that distinguish the "preserve the life, rape, or incest" classification from the "any other abortions" classification (and, therefore, makes the distinction constitutionally permissible). Those inherent characteristics are the "medical, moral, social, and ethical concerns" raised by the "preserve the life, rape, or incest" classification that are not raised by the "any other abortions" classification.

It is clear that the inherent characteristics of the "preserve the life, rape, or incest" classification do not require that the life of the pregnant woman be at stake. This classification includes abortions where the pregnancy was caused by rape or incest where there is no inherent threat to life. But if the "medical, moral, social, and ethical concerns" that justify Medicaid-funded abortions do not *require* that the life of the pregnant woman be at stake, what are the inherent characteristics that distinguish the abortions permitted by the "preserve the life, rape, or incest" classification from cases where the pregnant woman faces substantial and irreversible impairment of a major bodily function? The medical, moral, social, and ethical concerns are the same or at least the differences too insubstantial to be sustained by the State's justifications.

The application of the challenged statute and regulations to pregnant women who face substantial and irreversible impairment of a major bodily function is significant because the Legislature itself has identified it for special treatment in the State abortion control statute. For that

purpose, the Legislature has treated in exactly the same way cases where the life of the pregnant woman is at stake and cases where the woman faces substantial and irreversible impairment of a major bodily function. Indiana law forbids an abortion to be performed in Indiana unless the pregnant woman consents following specified disclosures provided to her at least 18 hours before the abortion is performed. Ind.Code § 16–34–2–1.1. However, the Legislature has exempted from these disclosure and waiting period cases where "the medical condition of a pregnant woman ... necessitates the immediate termination of her pregnancy to avert her death or for which a delay would create *serious risk of substantial and irreversible impairment of a major bodily function.*" Ind.Code §§ 16–18–2–223.5 (emphasis supplied) & 16–34–2–1.1; *A Woman's Choice–East Side Women's Clinic v. Newman,* 671 N.E.2d 104, 111 (Ind.1996) ("severe-but-temporary conditions in which an abortion is not the medically necessary treatment are not covered by the exception").

■ The fact that the Legislature has treated as a single classification in the abortion control statute "abortions for which a delay would create serious risk of

substantial and irreversible impairment of a major bodily function" and abortions necessary to preserve the pregnant woman's life reinforces our conclusion that the inherent characteristics of these cases (when combined with abortions where the pregnancy was caused by rape or incest) are so similar that disparate treatment is not justified under Medicaid. *McIntosh,* 729 N.E.2d at 981; *Martin,* 711 N.E.2d at 1280; *Collins,* 644 N.E.2d at 80. We find the challenged statute and regulations unconstitutional as applied to Medicaid-eligible women whose pregnancies create serious risk of substantial and irreversible impairment of a major bodily function. So long as the Indiana Medicaid program pays for abortions for Medicaid-eligible women where necessary to preserve the life of the pregnant woman or where the pregnancy was caused by rape or incest, we hold that it must pay for abortions for Medicaid-eligible women whose pregnancies create serious risk of substantial and irreversible impairment of a major bodily function.[9]

### Conclusion

It is the judgment of the Court that the challenged Medicaid statutes and regula-

---

9. The State, in addition to its arguments on Art I, § 23, sought summary judgment on two additional grounds.

First, it argued that the plaintiffs were barred from the relief they sought by Ind. Code § 12–15–5–2, which prohibits Indiana Medicaid from funding any service for which the federal government does not provide reimbursement. The trial court found, first, that one statute cannot save another found to be unconstitutional, and second, that the State does not strictly abide by the statute because the Indiana Medicaid program covers services for which federal financial participation is unavailable.

The State also argued that the Separation of Functions clause of Art. III, § 1, of the Indiana Constitution barred the court from granting the relief that the plaintiffs requested. The trial court found that if the chal-

lenged enactments violate the state Constitution, the Court could grant relief even if doing so means that state funds will be spent in a manner not explicitly approved of by the Legislature. "The Court has the power to shape appropriate remedies and the Legislature has a duty to appropriate funds to meet its constitutional obligations." (Supp. R. 12 (quoting *State v. Monfort,* 723 N.E.2d 407, 413 (Ind. 2000).))

While we do not necessarily agree with the trial court's reasoning, we affirm as to these issues. We believe the course of these proceedings effectively placed Ind.Code § 12–15–5–2 at issue. And as to the separation of powers issue, we believe that the general and open-ended nature of the Medicaid appropriation, combined with the limited relief provided, does not tread impermissibly upon the Legislature's appropriation prerogatives.

tion do not violate the Equal Privileges and Immunities Clause of the Indiana Constitution and are, therefore, constitutional except that, so long as the Indiana Medicaid program pays for abortions to preserve the lives of pregnant women and where pregnancies are caused by rape or incest, it must also pay for abortions for Medicaid-eligible women whose pregnancies create serious risk of substantial and irreversible impairment of a major bodily function. The trial court is reversed in part and affirmed in part.

SHEPARD, C.J., and DICKSON, J., concur in Part I and dissent from Part II.

BOEHM and RUCKER, JJ., dissent from Part I and concur in Part II.

SHEPARD, C.J., concurs and dissents with separate opinion.

DICKSON, J., concurs and dissents with separate opinion.

BOEHM, J., concurs and dissents with separate opinion in which RUCKER, J., concurs.

SHEPARD, Chief Justice, concurring and dissenting.

I join in Part I of Justice Sullivan's opinion, but not in Part II, which I think produces the wrong result.

A former colleague of ours once told us in conference (but never took occasion to say in writing) that for all the jurisprudential effort put into devising standards for trial and appellate review, the most that any articulated standard can achieve is to "tell the judge what mood to be in as he or she approaches a topic." Various standards tell us to be strict or liberal, deferential or non-deferential, to name a few.

The Court correctly announces the standard applicable to the present case. It is that the judiciary should defer to the lines drawn by the General Assembly and Governors Bowen and Bayh unless they are "arbitrary or manifestly unreasonable." Op. at 257, citing *Collins v. Day*, 644 N.E.2d 72, 80 (Ind.1994).

I cannot say that the decisions made on the very difficult topic of public payments for abortion, made by Indiana's elected representatives (and for that matter by the Congress and President Carter) are so arbitrary and unreasonable that they are unconstitutional.

DICKSON, Justice, concurring with Part I and dissenting from Part II.

I concur with the holding of Part I of Justice Sullivan's opinion for the Court, that Indiana's Medicaid abortion coverage restrictions do not violate the requirements of *Collins v. Day*, 644 N.E.2d 72 (Ind.1994), and thus do not violate Article 1, Section 23 of the Indiana Constitution.

The Indiana Privileges and Immunities Clause, Article 1, Section 23 of the Indiana Constitution, clearly permits enactment of laws that provide "disparate treatment" for different classes where the legislation is "reasonably related to inherent characteristics which distinguish the unequally treated classes." *Collins*, 644 N.E.2d at 80.

The Court correctly acknowledges that "the State's justifications of unavailability of federal financial participation, interest in protecting fetal life, fiscal policy, and administrative efficiency," and the uniform applicability of the Medicaid abortion benefit to all who qualify, are sufficient to sustain the constitutionality of the classification. Sullivan opin. at 257.

I believe it preferable, however, to address the specific classifications that were identified by the plaintiffs-appellees and trial court as receiving unequal treatment: (1) indigent men and women who need

treatment (other than abortion) which is medically necessary to preserve their health, and (2) indigent pregnant women needing to terminate their pregnancy to preserve and protect their health but whose pregnancies do not threaten their lives and were not the result of rape or incest. These two asserted classifications do not contrast the persons entitled to receive Medicaid abortions with those ineligible. Rather, they compare the treatment received by persons entitled to Medicaid benefits provided for non-abortion medical services with those seeking Medicaid-funded abortions. These two classifications receive different treatment in that the medical services for the second are limited to exclude abortions except in narrow circumstances. This disparate treatment is clearly related to the inherent characteristic that distinguishes the unequally treated classes: namely, the medical treatment in the second classification, abortion, requires the termination of fetal life. The legislative decision to impose restrictions upon Medicaid-funded abortions is obviously and reasonably related to whether the medical services involve the termination of fetal life. Thus, even using the classifications identified by the trial court and the appellees, the Indiana Medicaid abortion restrictions do not violate Section 23.

I dissent, however, from Part II and the Conclusion of the Court's opinion, which appears to condition the holding in Part I by judicially expanding Indiana's Medicaid abortion coverage to require the state to provide abortion benefits clearly not intended by the Indiana General Assembly.

Under Part II, the Indiana Medicaid program must now begin paying for abortions for Medicaid-eligible women whose pregnancies create a "serious risk of substantial and irreversible impairment of a major bodily function," even though the pregnancy does not present a threat to the woman's life. Sullivan opin. at 257. I believe that this conclusion and its rationale are erroneous.

The majority in Part II of Justice Sullivan's opinion purports to apply *Collins* but does so only by framing and then comparing its own two "classifications" of Medicaid-eligible pregnant women: (1) those for whom abortions are necessary to preserve their lives or where their pregnancies were caused by rape and incest, and (2) those who seek abortions for all other reasons, particularly the subset consisting of pregnant women whose pregnancies present a serious, but not life-threatening, risk of substantial and irreversible impairment of a major bodily function. Having combined in a single classification both those abortions needed to preserve the life of a pregnant woman and those abortions for pregnancies resulting from rape and incest, the majority in Part II then questions and dismisses the validity of the independent factors that reasonably relate to each subclassification by observing that these factors are not applicable in common to both sub-classifications. Upon this highly questionable premise, the majority then declares that the factors supporting each sub-classification are the same or their differences "too insubstantial" to justify different treatment. With this rhetorical device, Part II disregards the protection of fetal life, and the medical, moral, social, and ethical concerns that properly distinguish and justify the restrictions on Medicaid abortions.

Proper application of *Collins* to the majority's classifications would seem to require that the first one be separated into its two independent components: (a) pregnancies for which abortions are necessary to preserve the life of the pregnant woman, and (b) pregnancies resulting from rape or incest. As between those

abortions necessary to preserve the life of the pregnant woman and the majority's "substantial and irreversible impairment" subclass, the access to Medicaid-funded abortions for the former is clearly and reasonably related to the inherent difference that distinguishes the classes—the risk of the woman's death without an abortion. It is the legislature's prerogative to balance its interest in preserving fetal life with its interest in not placing the mother at risk of death. Likewise, as between abortions in pregnancies resulting from rape or incest and those in the "substantial and irreversible impairment" subclass, the access to Medicaid-funded abortions for the former is obviously related to the inherent difference distinguishing the classes—whether the pregnancy was caused by criminal conduct. It is neither arbitrary nor manifestly unreasonable for the legislature to conclude that the medical, moral, social, and ethical implications of a compelled pregnancy under these circumstances outweighs the government's interest in the preservation of fetal life. Furthermore, as to both subclasses ("risk of death" and "rape or incest"), the access to Medicaid-funded abortions that are denied to the "substantial and irreversible impairment" classification is reasonably related to the fact that the federal government reimbursement is not available for the latter. Such fiscal considerations by the legislature are within the considerable legislative discretion accorded under *Collins*.

The legitimate reasons that separately justify the Medicaid program's funding for abortions needed to preserve a woman's life and its funding for abortions where the pregnancy results from rape or incest cannot be neutralized by declaring these two groups merged into the same classification, and then finding their independent separate justifications thereby inconsequential because they do not simultaneously apply to both "risk of death" and "rape or incest" abortions.

Despite the requirement of *Collins* that we show substantial deference to the discretion of the legislature, the majority in Part II of Justice Sullivan's opinion disregards the clear and unequivocal language and intent of the Indiana General Assembly. Indiana Code section 16–34–1–2 explicitly declares: "Neither the state nor any political subdivision of the state may make a payment from any fund under its control for the performance of an abortion unless the abortion is necessary to preserve the life of the pregnant woman." The effect of Part II is to nullify this legislative limitation and to substantially expand the obligation of the Indiana Medicaid program to henceforth fund abortions for medical conditions that are not needed to save the mother's life.

An examination of Indiana Code section 16–34 *et seq.* makes clear that the legislature clearly intended and articulated a deliberate distinction between the two classes of women. Some statutes use broader language that is not limited to situations in which a pregnant woman is at risk of death. For example, section 16–34–2–1(a)(3)(C) criminalizes abortion performed after viability of the fetus unless the abortion is "necessary to prevent a substantial permanent impairment of the life *or physical health* of the pregnant woman." (emphasis added). Section 16–34–2–1.1 requires that certain information be given to a woman at least eighteen hours before an abortion *except in the case of a medical emergency*, which is defined in Indiana Code section 16–18–2–223.5 as a condition that "necessitates the immediate termination of [a woman's] pregnancy to avert her death or for which a delay would create serious risk of substantial and irreversible impairment of a major bodily function." Section 16–34–2–1.2 requires

that an abortion provider inform a woman facing a medical emergency of the medical indications supporting the provider's judgment that an abortion is necessary to prevent the mother's death or "a substantial and irreversible impairment of a major bodily function." Section 16–34–2–3(a) states that all abortions performed after viability shall be performed in a hospital having premature birth intensive care units unless compliance would result in "an increased risk to the life *or health* of the mother." (emphasis added). Subsection (b) requires there to be in attendance a second physician who shall care for a child born alive as a result of an abortion unless "compliance would result in an increased risk to the life *or health* of the mother." (emphasis added). In other statutes, however, it is clear that the legislature intended provisions or exceptions to apply *only* to women whose lives are in danger. Indiana Code section 16–34–2–1(a)(1)(B) states that, "if in the judgment of the physician the abortion is *necessary to preserve the life* of the woman, her consent is not required." (emphasis added). Indiana Code section 16–34–2–1(b) prohibits partial birth abortions unless a physician reasonably believes that it is *necessary to save the woman's life* and no other medical procedure is sufficient.

The fact that certain sections apply when a woman faces risk of death *or* impairment of a major bodily function, such as section 16–34–2–1.1, while other sections apply *only* when she faces risk of death, such as sections 16–34–2–1(b) and 16–34–1–2, indicates that the legislature's choice of language was precise and deliberate, demonstrating that the legislature intended to identify and treat differently these distinct classes of women with respect to the different statutory provisions.

In Part II, the majority imports the language of its new definition from Indiana Code section 16–18–2–223.5. This provision does not address any term used in the statute restricting eligibility for taxpayer-funded abortions, I.C. § 16–34–1–2, but rather provides an exception to the informed consent requirements of Indiana's general abortion law in cases of "medical emergency," which it defines as a condition that "complicates the medical condition of a pregnant woman so that it necessitates the immediate termination of her pregnancy to avert her death or for which a delay would create serious risk of substantial and irreversible impairment of a major bodily function." I.C. § 16–18–2–223.5. In *A Woman's Choice—East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 109 (Ind.1996), this Court construed this "medical emergency" definition to permit a physician to dispense with the informed consent provisions whenever the doctor concluded that an abortion was medically necessary in the doctor's clinical judgment based on "all relevant factors pertaining to a woman's health." By its importation of this language, the majority improperly scuttles the present restrictions in the Indiana Medicaid program's abortion coverage and appears to imply that Medicaid-eligible women may henceforth receive abortions at taxpayer expense in any case supported by the clinical judgment of a doctor based upon the woman's health factors, irrespective of whether she is at risk of death.

The majority's alarming expansion of the coverage is exacerbated by the fact that it imposes upon Indiana's Medicaid program the requirement to fund not only abortions necessary to prevent substantial and irreversible impairment of a major bodily function, but also abortions necessary to prevent even serious *risk* of the same. Plaintiffs claim in their brief that hypertension (high blood pressure) complicates approximately 8%—10% of pregnancies, and that "[a]lthough in most cases

serious harm to health can be averted, hypertensive pregnant women are at higher *risk* for cerebrovascular accidents (strokes), abruptio placentae (premature separation of the placenta from the uterus), and disseminated intravascular coagulation (a severe bleeding disorder)." Br. of Appellees at 5–6 (emphasis added). Plaintiffs also discuss the risks pregnancy can have on women with diabetes, including retinopathy (eye disease, including blindness) and nephropathy (kidney disease), a fourfold increase in the likelihood of pre-eclampsia or eclampsia and hypertensive diseases, and a tenfold increase in the risk of pregnancy-related death. Other conditions potentially necessitating abortion, according to the plaintiffs, are cancer that requires radiation or chemotherapy, and sickle cell anemia, which can cause "severe crises (especially in bones), infections such as pneumonia[,] ... increasingly severe anemia, congestive heart failure, and pulmonary complications such as embolus." Br. of Appellees at 7. Plaintiffs admit that "[w]hile these conditions may not always be life threatening, they *can* seriously and permanently compromise a woman's health." Br. of Appellees at 7 (emphasis added). Under Justice Sullivan's expanded definition, these conditions arguably may now warrant coverage under Indiana's Medicaid abortion coverage.

Thus Justice Sullivan's opinion, while purporting in Part I to find the enacted limitations on Medicaid abortion coverage constitutionally valid, nevertheless in Part II has the effect of granting almost all the relief sought by the plaintiffs in this case. In judicially repealing the express legislative pronouncement that state and local government funds cannot be used to pay for any abortion unless necessary to preserve the mother's life, the majority establishes a potentially ever-expanding set of medical conditions that may be transformed into entitlements for state-funded abortions for which there will be no federal Medicaid reimbursement. This is blatantly contrary to the intentions of both the Indiana General Assembly that enacted Indiana Code section 16–34–1–2 and Governor Evan Bayh who signed the bill into law.

For these reasons I dissent from Part II of Justice Sullivan's opinion. The fact that the Indiana Medicaid program does not pay for abortions in cases of "pregnancies that create for pregnant women serious risk of substantial and irreversible impairment of a major bodily function" does not render the challenged statute and regulations unconstitutional as applied.

BOEHM, Justice, dissenting as to Part I.

For the reasons given below, I respectfully dissent from Part I of the majority opinion. Twelve of the seventeen state courts that have considered the issue in published opinions have concluded that denial of benefits to indigent women for medically necessary abortions is a violation of their state constitution.[1] Under prevailing

---

1. *Perdue v. Planned Parenthood*, 28 P.3d 904 (Alaska 2001); *Simat Corp. v. Arizona Health Care Cost Containment Sys.*, 203 Ariz. 454, 56 P.3d 28 (2002); *Comm. to Defend Reprod. Rights v. Myers*, 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779 (1981); *Doe v. Maher*, 40 Conn.Supp. 394, 515 A.2d 134 (1986); *Roe v. Harris*, 128 Idaho 569, 917 P.2d 403 (1996); *Doe v. Wright*, No. 91 Ch. 1958, slip op. (Ill. Cir.Ct. Dec. 2, 1994), leave to file late appeal denied, No. 78512 (Ill. Feb. 28, 1995); *Moe v. Sec'y of Admin. & Fin.*, 382 Mass. 629, 417 N.E.2d 387 (1981); *Women of Minnesota v. Gomez*, 542 N.W.2d 17 (Minn.1995); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982); *New Mexico Right to Choose/NARAL v. Johnson*, 126 N.M. 788, 975 P.2d 841 (1998); *Planned Parenthood Ass'n. v. Dep't of Human Res.*, 63 Or.App. 41, 663 P.2d 1247 (1983), aff'd on other grounds, 297 Or. 562,

constitutional doctrine in this state, I would reach the same result.

There is no doubt that a pregnant woman has the right to elect an abortion as set forth in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There is no doubt that the State may elect to have a Medicaid program or not to have one. And there is no doubt that the State may elect to fund medical procedures for the indigent without providing the same benefit to all citizens. Finally, it is plain on the face of the Medicaid statute that by restricting abortion benefits to those necessary to prevent death of the mother or to terminate pregnancies generated by rape or incest, the Indiana Medicaid program seeks to provide different benefits for some abortions than it does for other "medically necessary" procedures.

The plaintiffs here posit their claim as a constitutionally impermissible distinction arising from Medicaid's refusal to fund medically necessary abortions for certain indigent women while providing benefits for all other indigents in need of medical treatment. The plaintiffs are entitled to frame their own complaint, so this different treatment is the issue presented in this case. Plaintiffs do not base their challenge on a comparison of funding for pregnancies arising from rape or incest or threatening the woman's life to funding for other abortions. It therefore seems to me that the Indiana constitutional issue presented by this case is simply stated: is it permissible under Article I, Section 23 for the State to provide funding for medically necessary treatment for indigents generally, but to refuse it for medically necessary abortions unless the mother's life is at stake or the pregnancy results from rape or incest? I conclude it is not, as to those pregnancies for which the federal constitution guarantees the woman the right to make the election to terminate her pregnancy.

## I. Equal Privileges Under the Indiana Constitution

The plaintiff's constitutional challenge to this legislation is based solely on the Equal Privileges Clause found in Article I, Section 23 of the Indiana Constitution. The test for constitutionality under that clause is established in *Collins v. Day*, 644 N.E.2d 72 (Ind.1994), and is accurately recited by the majority:

> First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

*Id.* at 80.

Although the *Collins* formulation is often described as a "two-pronged" test, it really breaks down into three components because the first "prong" establishes two requirements: 1) the classification must be based on "characteristics" that "rationally distinguish the unequally treated class", and 2) the "disparate treatment" must be "reasonably related" to the characteristics that define the class. I think this means,

687 P.2d 785 (1984); *Women's Health Ctr. Of West Virginia, Inc. v. Panepinto*, 191 W.Va. 436, 446 S.E.2d 658 (1993). *But see Renee B. v. Fla. Agency for Health Care Admin.*, 790 So.2d 1036 (Fla.2001); *Doe v. Dep't of Social Servs.*, 439 Mich. 650, 487 N.W.2d 166 (1992); *Rosie J. v. North Carolina Dep't of Human Res.*, 347 N.C. 247, 491 S.E.2d 535 (1997); *Fischer v. Department of Pub. Welfare*, 509 Pa. 293, 502 A.2d 114 (1985); *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253 (Tex. 2002).

in simple terms, that the class must be defined by a characteristic that is not arbitrary or otherwise impermissible and that the difference in legislative treatment must be reasonably related to the difference between the classes. The second "prong" of *Collins* imposes a third test: everyone who is in fact in the class (i.e., everyone who shares the defining characteristic) must be treated alike, and everyone who is not in the class must be treated alike. As we noted in *McIntosh v. Melroe Co.*, 729 N.E.2d 972 (Ind.2000), the "characteristic" that defines the legislative class is not necessarily innate (e.g., race, national origin). It may be a mutable characteristic that the same person may have as of a given time, but lack at others (e.g., people who are over age sixty-two can elect to receive Social Security benefits, but are ineligible before attaining that age; a corporation with seventy-five or fewer shareholders can elect to be taxed more or less as a partnership, but is ineligible with seventy-six shareholders). Or, as in *McIntosh*, the classification may be based on a sequence of events (persons injured by products in use for over ten years have no claim under the Product Liability Act).[2] And so on.

Here the relevant characteristics defining the class generally entitled to Medicaid benefits are indigence and desire for a medically necessary treatment. In Section 23 terms, the Medicaid statute confers a privilege on those persons. The plaintiffs here are indigent and seek reimbursement for procedures that are "medically necessary" as that term is used in the Medicaid statute. The State refuses to pay because the requested medical treatment would terminate a pregnancy that is neither life endangering nor the result of rape or incest. Therefore, the defining characteristic of the classification of citizens this legislation draws is those women who are (1) requesting a medically necessary abortion and (2) otherwise eligible for Medicaid benefits but (3) whose pregnancy is neither life endangering nor a result of rape or incest. The result is that this legislation confers a privilege by providing benefits to indigents requiring medically necessary treatment, but withholds that privilege from poor women in need of medically necessary abortions to terminate a pregnancy that is neither life threatening nor originated by rape or incest. The statute thus sets up a scheme for funding abortions that is different from that for funding for all other medical treatment.

## II. Equal Protection Under the Federal Constitution

In order to understand the higher standard demanded by the state constitution, it is important to review the basis of the holding that the federal constitution does not prevent the states from imposing this condition on funding for indigent medical care. In *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), the United States Supreme Court, in a 5–4

2. In some sense, the claim asserted under the Equal Privileges Clause always defines the class because it sets forth the plaintiff's theory, and therefore presumably defines the class that is claimed to be unequally treated. However, I do not agree with the majority that "this claim defines the class" as that term is used in *McIntosh*. The issue in that case was whether the statute of repose in the Product Liability Act violated Article I, Section 23 by shutting off claims based on products in use over ten years before the event giving rise to the plaintiff's injury. In saying that the "claim ... defines the class," *McIntosh* referred to the claim of the plaintiffs in the underlying product liability case, not to the claim of unconstitutionality. In other words, the claim that defined the class was the claim that the plaintiff was injured by a product more than ten years old, not the claim that the statute of repose violated the Indiana Constitution.

decision, established that federal equal protection doctrine did not prohibit the federal government from enacting a federal statute, the Hyde Amendment, that denies federal reimbursement for the procedures at issue here. In reaching that conclusion, the majority relied on prevailing federal equal protection doctrine. The only Equal Protection Clause in the federal constitution is found in the Fourteenth Amendment which imposes limitations on state legislation, but does not apply to federal statutes. Indeed, until 1954, it was accepted dogma that there was no equal protection doctrine applicable to federal legislation. Kenneth L. Karst, *The Fifth Amendment Guarantee of Equal Protection*, 55 N.C. L.Rev. 541, 542 (1971); *see, e.g., Detroit Bank v. United States*, 317 U.S. 329, 337, 63 S.Ct. 297, 87 L.Ed. 304 (1943). The Supreme Court for the first time found equal protection applicable to a federal law in a companion case to *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) addressed segregation in the schools of the District of Columbia. Because the District of Columbia was a federal enclave and not a state, the Fourteenth Amendment did not apply. The Supreme Court unanimously held that the Due Process Clause of the Fifth Amendment required no less than the Equal Protection Clause of the Fourteenth Amendment, finding it "unthinkable" that the federal government could impose distinctions that the Constitution forbids to the states. By the mid 1970's, it had become accepted that the equal protection doctrine developed under the Fourteenth Amendment with respect to state laws applied equally to federal legislation. *See,*

*e.g., Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).[3] It was within this legal framework that *Harris* upheld the federal Hyde Amendment in 1980.

The four-Justice majority in *Harris* first found that the Hyde Amendment did not itself "impinge on a right or liberty protected by the [federal] Constitution." *Id.* at 322, 100 S.Ct. 2671. This was based on the conclusion, in addressing claims under the federal Due Process Clause, that although there is a federal constitutional right to elect an abortion under *Roe v. Wade*, there is no federal constitutional right to receive funding for an abortion.

Because no federal constitutional right was impinged, and indigent pregnant women were not a suspect class, the majority in *Harris* evaluated the federal equal protection claim under the standard taken from *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961): the classification must be sustained unless it "rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective." *Harris*, 448 U.S. at 322, 100 S.Ct. 2671 (brackets in original). The majority recognized a legitimate governmental interest in protecting human life by "subsidizing the medical expenses of indigent women who carry their pregnancies to term while not subsidizing the comparable expenses of women who undergo abortions." *Id.* at 325, 100 S.Ct. 2671. Accordingly, the *Harris* majority held that nothing in the federal equal protection doctrine prevents a state from refusing to fund medically necessary abortions for indigent women. The majority thus relied on the prevailing "rationality" test for federal equal protection: a legislative classification requires only "a rational relationship to any legitimate governmen-

---

**3.** For an account of this journey, which includes a few detours, see generally *Adarand*

*Constructors, Inc. v. Pena*, 515 U.S. 200, 219, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

tal interest." John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 14.3, at 644 (6th ed. 2000).

Four Justices dissented in *Harris*, taking the view that the Hyde Amendment and its consequent state implementations imposed an impermissible burden on the exercise of a woman's constitutionally protected right to choose. For that reason, some of the dissenters did not address the federal equal protection claims raised in that case. Justice Marshall, however, did find both due process and equal protection violations in a scheme that provides government funding for one choice, but not for the other, when the right to make that election is itself constitutionally protected. In addition to placing an impermissible burden on the exercise of a constitutionally protected right in violation of the federal Due Process Clause, Justice Marshall concluded that the classification effected by the statute did not pass the federal equal protection test formulated by the majority. In his view, the asserted governmental interest—protection of human life—was not rational as that term is used in equal protection doctrine because it is, as a matter of federal constitutional law, subordinate to the individual women's "interest in preserving their lives and health by obtaining medically necessary treatment." *Harris*, 448 U.S. at 346, 100 S.Ct. 2701.

I agree that the *Harris* majority identified a legitimate governmental interest in promotion of human life. This is a factor supporting the policy found in both the federal Hyde Amendment and the Indiana statute at issue here. The state has a second valid consideration in its concern for public expenditures. The federal government has elected not to participate in funding of medical procedures to terminate these pregnancies. The result is the state bears all of any cost, not merely approximately thirty-eight percent. The parties cite various studies suggesting that funding abortion would have a financial impact of zero or even a positive effect on total federal and state Medicaid expenses. This conclusion is based on comparisons to the cost of delivering the child and bearing its subsequent health-care costs. Thus, the federal decision to deny benefits may indeed rely solely on social policy, not financial considerations. However on this record I cannot conclude that the State's claimed financial concerns are a sham. Evaluation of that factor is therefore a matter for the legislature. Given that the federal scheme embodied in the Hyde Amendment treats these pregnancies differently than it does all other medically necessary procedures, plaintiffs have not established that it is fiscally irrational for the state legislature to refuse to underwrite the entire expense rather than the sixty-two percent it bears for all other medical expenses. As the majority points out, the legislature is entitled to substantial deference in drawing lines where judgment is required in balancing competing interests. For both these reasons, I agree that under the rationality test adopted by the *Harris* majority, which requires only some minimal governmental interest in the absence of a suspect class or a directly infringed constitutional right, no federal equal protection violation is to be found. But both the analysis and the result are different under the Indiana Constitution.

### III. The Plaintiffs' Claim Under the Indiana Constitution

The Indiana constitutional provision that the plaintiffs invoke is not equal protection, but rather the Equal Privileges Clause found in Article I, Section 23. It provides: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." As *Collins* pointed out, Arti-

cle I, Section 23 of the Indiana Constitution is quite different in both its language and its meaning from the federal Equal Protection Clause whose doctrines governed the United States Supreme Court majority in *Harris*. By demanding that legislative privileges be dispensed "equally", and plainly applying to treatment of Indiana's own citizens, it also differs significantly from the Privileges and Immunities Clause of the Fourteenth Amendment. The Equal Privileges Clause was found in the Indiana Constitution well before 1868 when the Fourteenth Amendment introduced both the Equal Protection Clause and the Privileges and Immunities Clause into the United States Constitution. Some regarded the Privileges and Immunities Clause, not either the Equal Protection or Due Process Clause, to be the primary guarantor of individual rights against state intrusion. Nowak & Rotunda, *Constitutional Law* § 14.1 at 632. The federal Privileges and Immunities Clause prohibits state laws that "abridge the privileges or immunities of citizens of the United States" but makes no mention of "equal" treatment. *The Slaughter–House Cases*, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872), promptly held this provision to apply only to state laws that discriminate in favor of their own citizens and against outsiders. Thus, the federal Privileges and Immunities Clause was rendered a dead letter as a limitation on a state's ability to restrict rights of its own citizens. That result was based in large part on the view that the Fourteenth Amendment "was not intended to displace the critical role of the states as protectors of their own citizens." Lawrence H. Tribe, *Constitutional Law* § 14 at 10 (3d ed. 2000). Thus, for over a century,[4] the Privileges and Immunities

Clause of the Federal Constitution was thought to defer to its counterparts in state constitutions. It is the Indiana Equal Privileges Clause that is in issue here, and for the reasons explained below, I believe it requires more than either the Equal Protection Clause or the Privileges and Immunities Clause of the Fourteenth Amendment. In the course of establishing its standard for constitutional legislative classifications under the Indiana Equal Privileges Clause, *Collins* explicitly rejected the federal equal protection approach of degrees of scrutiny. *Collins*, 644 N.E.2d at 80. Rather, "[t]he protections assured by Section 23 apply fully, equally, and without diminution to prohibit any and all improper grants of unequal privileges or immunities, including not only those grants involving suspect classes or impinging upon fundamental rights but other such grants as well." *Id.* at 80. Thus, all claims of unequal privilege are evaluated under the test described in Part I of this opinion.

The method chosen—denial of funding—undoubtedly meets the requirement that the legislation be related to the goal of promoting human life. But I believe the legislation fails the *Collins* requirement that the classification be reasonably related to the legislative objectives. The plaintiffs point to other measures, such as denying scholarships at universities to women who elect abortions, that they contend might also be justified in the name of deterring abortions, if the State's Medicaid statutes are upheld. Although these hypothetical examples are not before us today, in general I think they raise the issue whether the disparate treatment is "reasonably related" to the defining character-

---

4. Only at the end of the twentieth century did the federal Privileges and Immunities Clause emerge from the shadows to which the *Slaughter–House Cases* banished it, and its

future remains at best uncertain. *Saenz v. Roe*, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999).

istic, and not whether the class is defined by a permissible characteristic.

Under *Collins,* as Justice Sullivan points out, the reasonableness of the relationship between the classification and the legislative objective turns on a balancing test. The woman's right under the Constitution of the United States to elect an abortion is established by *Roe v. Wade,* irrespective of the origin of the pregnancy or whether her life is threatened by carrying the fetus to term. The U.S. Supreme Court in *Roe* held, "the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Roe,* 410 U.S. at 164–65, 93 S.Ct. 705. Thus, the right to choose is not absolute, but the interest of the State in promoting childbirth is constitutionally subordinate to the woman's right to choose to protect her life and her health. As explained above, under *Harris,* federal equal protection doctrine would permit the State to deny funding even if its interest—promotion of human life—is offset and outweighed by other interests as long as the legislation disadvantages no suspect classification and impinges no fundamental right. But the Indiana Constitution is rife with provisions asserting the primacy of individual rights. The 1851 Constitution, like its 1816 predecessor, begins with a Bill of Rights and only later turns to provisions establishing the branches of government. The Bill of Rights starts with Article 1, Section 1, which borrows from the Declaration of Independence in asserting rights to life, liberty and pursuit of happiness. This emphasis on individual rights reflected the strong populist sentiment prevailing at the 1851 convention, which essentially carried out the agenda set in 1816. *See Price v. State,* 622 N.E.2d 954, 962 n. 11 (Ind.1993). In the same vein, the Indiana Equal Privileges Clause elevates individual rights by requiring more than some recognized governmental interests before legislation can override the interests of the individual. Thus, under *Collins* a "rational relationship to any legitimate governmental interest" is not enough to carry the day. Under the balancing test of our state constitution, the governmental interests must outweigh those of the private citizen before a statute may deny a privilege granted to others. Under this standard, when faced with the federal constitutional right of a woman to choose to protect her health, the State's interests fail to carry that burden.

This case presents a classic confrontation between individual rights and the will of the majority as reflected in legislation. The law at issue here affects only women who are indigent and desire a medically necessary procedure. The effect of the statute is to impose a financial penalty on a woman's election to exercise her constitutionally guaranteed right to choose. Of course, as a practical matter, this financial obstacle may result in delays that complicate the woman's medical condition, and often may force the result of a choice that is for the woman alone to make. The State thus seeks to impose its choice upon the woman to whom that decision is constitutionally reserved. By so choosing, the State seeks to prioritize the interest it advances over the woman's right to choose. Whether the State seeks to advance its interest by criminalizing abortions, as it no longer can do, or by creating legislation that penalizes the exercise of that right, either is, as a matter of constitutional priorities, an unreasonable balance. As such, this legislation imposes an unreasonable classification and is invalid under *Collins.*

Justice Sullivan concludes that indigent women whose pregnancy risks serious and permanent impairment of a major bodily

function may not be denied Medicaid benefits. Those women are a subset of all indigents in need of medically necessary procedures. Accordingly, I concur in Part II of Justice Sullivan's opinion, though it does not grant all of the relief to which I believe the plaintiffs are entitled.

RUCKER, J., concurs.