**Ruth MORRISON, et al., Appellants–Plaintiffs,**

v.

**Doris Ann SADLER, et al., Appellees–Defendants.**

**No. 49A02–0305–CV–447.**

Court of Appeals of Indiana.

Jan. 20, 2005.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, Attorney for Appellants.

Anthony Overholt, Office of Corporate Counsel, Indianapolis, IN, Attorney for Appellee, Doris Ann Sadler, in her official capacity as Clerk of the Marion Circuit Court.

Gregory E. Steuerwald, Deckard & O'Brien, Danville, IN, Attorney for Appellee, Sharon Dugan, in her official capacity as Clerk of the Hendricks Circuit Court.

Thomas M. Fisher, Special Counsel, Indianapolis, IN, Attorney for Intervenor, Steve Carter, Attorney General of Indiana.

Cara C. Putman, Bennett Boehning & Clary, Lafayette, IN, Attorney for Amicus Curiae, Focus on the Family and Family Research Counsel.

Brian E. Bailey, Indianapolis, IN, Attorney for Amicus Curiae, Catholics Allied for the Faith, Inc.

Herbert A. Jensen, Jensen & Associates, Indianapolis, IN, Attorney for Amicus Curiae, Honorable Members of the Indiana General Assembly.

Charles P. Rice, Boveri Murphy Rice Ryan and LaDue, LLP, South Bend, IN, Attorney for Amicus Curiae, Society of Catholic Social Scientists.

Eric Allan Koch, The Koch Law Firm, Bloomington, IN, Paul Benjamin Linton, Pro hac vice, Northbrook, IL, Attorneys for Amicus Curiae, The Indiana Family Institute, The American Family Association of Indiana, Eagle Forum of Indiana.

## OPINION

BARNES, Judge.

### Case Summary

Ruth Morrison and Theresa Stephens, David Wene and David Squire, and Charlotte Egler and Dawn Egler (collectively "the Plaintiffs") appeal the trial court's dismissal of their complaint seeking to obtain marriage licenses from the Hendricks and Marion County Circuit Court clerks. The Attorney General of Indiana has intervened on behalf of the clerks (collectively "the State"). Additionally, five amicus curiae briefs have been filed supporting the State by the following parties: the Society of Catholic Social Scientists;[1] Catholics Allied for the Faith; Focus on the Family and the Family Research Council; seven members of the Indiana General Assembly; and the Indiana Family Institute, the American Family Association of Indiana, and the Eagle Forum of Indiana. After careful consideration of this issue, we affirm.

### Issues

The issues before us are whether Indiana's statutory limitation of marriage to opposite-sex couples violates any of the following provisions of the Indiana Constitution: Article 1, § 23, Article 1, § 1, or Article 1, § 12.

---

1. Several Catholic Indiana bishops originally joined in this brief, but they later were given permission to withdraw from the case.

## Facts

The Plaintiffs are three same-sex couples who have been living together in long-term relationships. All three couples have traveled to Vermont to enter into civil unions permissible under that state's statutory framework. Charlotte Egler and Dawn Egler together are raising a child who was conceived by using assisted reproduction technology.

The predecessor to current Indiana Code Section 31-11-1-1(a) was passed in 1986. Similar statutes, commonly referred to as "Defense of Marriage Acts" ("DOMA"), have been passed by at least thirty-seven other states and the federal government. The relevant portion of Indiana's DOMA at issue today states: "Only a female may marry a male. Only a male may marry a female."[2] Ind.Code § 31-11-1-1(a). All three couples meet the legal requirements for marriage aside from being of the same gender.

On August 22, 2002, the Plaintiffs filed a declaratory judgment complaint seeking an injunction requiring the Hendricks and Marion County clerks to issue marriage licenses to them because Indiana's DOMA violated several provisions of the Indiana Constitution, namely, Article 1, § 23; Article 1, § 1; and Article 1, § 12. After the Plaintiffs filed a second amended complaint, the trial court granted the State's motion to dismiss on May 7, 2003, for failing to state a claim upon which relief could be granted. The Plaintiffs now appeal.

## Analysis [3]

Before considering the Plaintiffs' contentions based on the Indiana Constitution, it is helpful to briefly mention federal law in this area as it helps explain both the Plaintiffs' and the State's approaches to this case. The Plaintiffs make no explicit argument that Indiana's limitation of marriage to opposite-sex couples violates the United States Constitution. There is binding United States Supreme Court precedent indicating that state bans on same-sex marriage do not violate the United States Constitution. In *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971), the Minnesota Supreme Court held that a ban on same-sex marriages did not violate the Fourteenth Amendment. In so holding,

---

**2.** Pursuant to a 1997 amendment, the statute also provides that a same-gender marriage is void in Indiana even if it was valid in the place in which it was solemnized. Ind.Code § 31-11-1-1(b). This provision is not at issue today; the Plaintiffs originally made a "full faith and credit" argument in their first complaint regarding Indiana's failure to attach any significance to their Vermont civil unions, but they make no such argument on appeal.

**3.** We are fully cognizant of the great turmoil this issue is causing throughout the country. Since we heard oral argument in this case on January 12, 2004, the Massachusetts Supreme Judicial Court has clarified that only same-sex marriage, not civil unions, will satisfy that state's constitution. *In re Opinions of the Justices to the Senate*, 440 Mass. 1201, 802 N.E.2d 565 (2004). Same-sex couples have been marrying in Massachusetts since May of 2004. The city of San Francisco at the di-

rection of its mayor issued marriage licenses to thousands of same-sex couples, and officials in other locales such as Portland, Oregon, Sandoval County, New Mexico, and the village of New Paltz, New York, followed San Francisco's lead before being forced to stop. Lawsuits similar to the one before us are now pending in many other states. In early 2004, the Indiana Senate approved a resolution to amend the Indiana Constitution to prohibit same-sex marriage, and which resolution created a firestorm of controversy in the Indiana House of Representatives that effectively shut down and failed to pass that chamber of the General Assembly. In the most recent general election, voters in eleven states chose to amend their state constitutions to ban recognition of same-sex marriage; in eight of these states, civil union status for same-sex couples was also barred. Two other states passed similar measures earlier in 2004.

the court rejected the same-sex couple plaintiffs' principal argument that *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), required that they be issued a marriage license. The court stated that *Loving*, which held bans on interracial marriages violated the Fourteenth Amendment, was decided solely on the grounds of the patent racial discrimination of such statutes. *Baker*, 191 N.W.2d at 187. It also stated, "in commonsense and in a constitutional sense, there is a clear distinction between a marital restriction based merely upon race and one based upon the fundamental difference in sex." *Id.*

The couple appealed to the United States Supreme Court, which dismissed the appeal without opinion "for want of a substantial federal question." *Baker v. Nelson*, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). Under procedural rules in effect at the time, the Plaintiffs do not contest that, unlike a denial of certiorari, such a dismissal represented a decision by the Supreme Court *on the merits* that the constitutional challenge presented was insubstantial, and which decision is binding on lower courts. *See Hicks v. Miranda*, 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975). Thus, the Supreme Court, five years after it decided *Loving*, determined that that case did not support an argument by same-sex couples that precluding them from marrying violated the Fourteenth Amendment. In light of this precedent, the Plaintiffs have not made a Fourteenth Amendment argument in this case.

There has been a change in attitude in the Supreme Court regarding homosexual relationships since 1972. In *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), the Supreme Court declared Texas' ban on sodomy unconstitutional as violating substantive due process, overruling *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986). Justice Kennedy's lead opinion was careful to state that the case did not involve "whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence*, 539 U.S. at 578, 123 S.Ct. at 2484. Also, he noted the gradual disappearance of anti-sodomy laws throughout the country and the world and the historical fact that they were infrequently enforced even when and where they existed. *Id.* at 572–73, 123 S.Ct. at 2481. By contrast, there currently is an active effort to ban same-sex marriages throughout the country as evidenced in part by the DOMA and constitutional amendment movements; such bans are not moribund as were the anti-sodomy laws. Additionally, Justice O'Connor in her separate concurrence, relying on the Equal Protection Clause, stated that "[u]nlike the moral disapproval of same-sex relations—the asserted state interest in this case—other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group," and that "preserving the traditional institution of marriage" *is* a legitimate state interest to support distinguishing between homosexuals and heterosexuals. *Id.* at 585, 123 S.Ct. at 2487–88.

The five justices of the *Lawrence* majority, as well as Justice O'Connor in her concurring opinion, do not appear to be prepared to extend the logic of their reasoning to the recognition of same-sex marriage. Nonetheless, the State conceded at oral argument in this case that *Lawrence* effectively forecloses the possibility of relying upon moral disapproval of homosexual relationships as the sole justification for limiting marriage to opposite-sex couples only. The State, in fact, did not rely at all

upon such disapproval in its arguments.[4]

With this limited overview of federal law, the analysis now turns to state law, first noting the general standard of review. A complaint may not be dismissed for failure to state a claim upon which relief can be granted unless it is clear on the face of the complaint that the complaining party is not entitled to relief. *City of New Haven v. Reichhart*, 748 N.E.2d 374, 377 (Ind.2001); Ind. Trial Rule 12(B)(6). The pleadings are viewed in the light most favorable to the nonmoving party and every reasonable inference must be drawn in favor of that party. *Reichhart*, 748 N.E.2d at 377. When reviewing a dismissal for failure to state a claim, we accept as true the facts alleged in the complaint and will affirm the dismissal if the complaint states a set of facts that, even if true, would not support the relief requested in that complaint. *Id.* at 377–78. The trial court's ruling will be affirmed if it is sustainable on any basis found in the record. *Id.* at 378.

### I. Article 1, § 23 Claim

The Plaintiffs' first argument is that Indiana Code Section 31–11–1–1, expressly limiting the benefits and obligations of marriage to opposite-sex couples only, violates the Equal Privileges and Immunities Clause of Article 1, § 23 of the Indiana Constitution.[5] Article 1, § 23 states: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." This provision imposes two requirements upon statutes that grant unequal privileges or immunities to differing classes of persons.

First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

*Collins v. Day*, 644 N.E.2d 72, 80 (Ind. 1994). Unlike federal equal protection analysis, there is no varying or heightened level of scrutiny based on the nature of the classification or the nature of the right affected by the legislation. *Id.*

The State has no burden to demonstrate that the statute is constitutional; the burden is entirely upon the Plaintiffs to overcome the presumption of constitutionality and to establish a constitutional violation. *See Dvorak v. City of Bloomington*, 796 N.E.2d 236, 239 (Ind. 2003). Enactments challenged under the Indiana Constitution are presumed to be constitutional until clearly overcome by a contrary showing, and any doubts are re-

**4.** The morality argument is present in some of the amici briefs, most notably that of Catholics Allied for the Faith.

**5.** Amicus Indiana Family Institute asserts that the General Assembly has "plenary and exclusive" authority over the regulation of marriage, with the exceptions of it being prohibited by Article 4, § 22 of the Indiana Constitution from granting "special" divorces and being subject to the requirements of the federal constitution. Amicus essentially argues with respect to claims that a marriage statute violates the Indiana Constitution, such a claim is non-justiciable and such a statute a priori can never violate the Indiana Constitution under any circumstances. We simply cannot accept, for example, that a ban on interracial marriages, while clearly violating the federal constitution, would not even present a justiciable claim under the Indiana Constitution. We will address the merits of the Plaintiffs' arguments.

solved against the party bringing the challenge. *Id.* at 237–38. The party challenging the statute must "negative every conceivable basis which might have supported the classification." *Collins*, 644 N.E.2d at 80 (quoting *Johnson v. St. Vincent Hosp.*, 273 Ind. 374, 404–05, 404 N.E.2d 585, 604 (1980)). *Collins* requires only that the disparate *treatment* accorded by legislation, not the *purposes* of the legislation, be reasonably related to the inherent characteristics that distinguish the unequally treated classes, although legislative purposes may be a factor considered in making the reasonable relationship determination. *Dvorak*, 796 N.E.2d at 239. However, our supreme court has also stated that it will not "inquire into the legislative motives prompting such classification." *Collins*, 644 N.E.2d at 80 (quoting *Chaffin v. Nicosia*, 261 Ind. 698, 701, 310 N.E.2d 867, 869 (1974)). Rather, "[l]egislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable. So long as the classification is based upon substantial distinctions with reference to the subject matter, we will not substitute our judgment for that of the legislature. . . ." *Id.*

The practical effect of *Collins* and cases following it is that statutes will survive Article 1, § 23 scrutiny if they pass the most basic rational relationship test. In fact, our research has revealed that of the approximately ninety reported "Equal Privileges and Immunities" cases following *Collins* and its clarification of Article 1, § 23 analysis, only three have finally resulted in holdings (after supreme court review) that a particular statute violated Article 1, § 23. Two of those cases were *Martin v. Richey*, 711 N.E.2d 1273 (Ind. 1999), and *Van Dusen v. Stotts*, 712 N.E.2d 491 (Ind.1999), which both held that the two-year occurrence-based statute of limitations for medical malpractice actions violated Article 1, § 23, but only as applied to those particular plaintiffs. Additionally, in *Humphreys v. Clinic for Women, Inc.*, 796 N.E.2d 247 (Ind.2003), the court held that Indiana's restriction of Medicaid coverage for abortions to cases of rape, incest, or endangerment of the mother's life was facially valid under Article 1, § 23, but violated that provision as applied to women who needed an abortion to avoid serious risk of substantial and irreversible impairment of a major bodily function, but not necessarily death.[6] No statute or ordinance has ever been declared facially invalid under the *Collins* test.[7]

The Plaintiffs here challenge Section 31–11–1–1 only under the first part of the *Collins* test: they contend the disparate treatment accorded by the statute is not reasonably related to inherent characteristics that distinguish the unequally treated classes, i.e., opposite-sex couples and same-sex couples.[8] The Plaintiffs also

---

**6.** Most recently, in yet another case concerning the Medical Malpractice Act's statute of limitations, we held that it would violate Article 1, § 23 to read the Act as prohibiting the parents of a deceased child from bringing a wrongful death suit more than two years after the alleged act of malpractice that led to the death, but within months of the death itself. *Ellenwine v. Fairley*, 818 N.E.2d 961, 969–70 (Ind.Ct.App.2004). A petition to transfer is currently pending before our supreme court.

**7.** One commentator has stated that "although Indiana's 'equal privileges and immunities'

language has been held to have a different meaning from the Federal Equal Protection Clause, the linguistic difference has not led to significantly different outcomes, and the Indiana standard may be less restrictive of legislative classification than the federal rule." Jon Laramore, *Indiana Constitutional Developments: The Wind Shifts*, 36 Ind. L.Rev. 961, 962 (2003).

**8.** The State briefly argues that there is not even a legislative "classification" at issue here for purposes of *Collins* because the statute only differentiates between couples, not indi-

note the extent of the differential treatment caused by prohibiting same-sex couples from marrying, such as with respect to evidentiary privileges for spousal communications, the making of health care decisions for a spouse, inheritance rights, and various government benefits. The Plaintiffs assert that there are three possible, but ultimately unreasonable, reasons for the legislative classification: to promote procreation and child-rearing by both natural parents, to promote the traditional family unit, and to promote the integrity of traditional marriage. The State agrees that these are the justifications for the differential treatment but, of course, claims that they are sufficiently rational justifications under the *Collins* test. We are satisfied that the Plaintiffs, as the ones challenging the statute, have failed to demonstrate that the marital procreation justification is manifestly unreasonable or arbitrary. Because we make this determination, we will not address the other two proffered justifications.

We begin by noting one of the Plaintiffs' overarching arguments, namely their claim that recognizing same-sex marriage would not directly harm the traditional institution of opposite-sex marriage and the State's interest in marital procreation. We conclude the Plaintiffs' claim that recognizing same-sex marriage or unions will not *harm* the institution of opposite-sex marriage is not dispositive of the constitutional issue before this court. The key question in our view is whether the recognition of same-sex marriage would promote all of the same state interests that opposite-sex marriage does, including the interest in marital procreation. If it would not, then limiting the institution of marriage to opposite-sex

couples is rational and acceptable under Article 1, § 23 of the Indiana Constitution.

The Plaintiffs also argue that the overall purpose behind all of Indiana's Family Law Code is the protection of families. The statutory preamble to the Code listing its policies and purposes includes "recogniz[ing] the importance of family and children in our society," "recogniz[ing] the responsibility of the state to enhance the viability of children and family in our society," and "strengthen[ing] family life by assisting parents to fulfill their parental obligations...." Ind.Code § 31–10–2–1. They also note that pursuant to a decision by this court, same-sex couples are permitted to adopt children. *See In re Adoption of M.M.G.C.*, 785 N.E.2d 267 (Ind.Ct.App. 2003); *see also In re Adoption of K.S.P.*, 804 N.E.2d 1253 (Ind.Ct.App.2004). They further note that aside from certain testing and record-keeping requirements, the field of assisted reproduction has been left largely unregulated in Indiana. *See* I.C. §§ 16–41–14–1 to 20. Finally, they claim, and we do not dispute, that large numbers of same-sex couples in this state are choosing to raise children together, either by adoption or taking advantage of assisted reproduction technologies. Based upon these facts, the essence of the Plaintiffs' argument is that it contravenes the central purpose of the Indiana Family Law Code to deny marriage to same-sex couples because although many of them are raising families, they are precluded from the multiple benefits associated with marriage. Likewise, the Plaintiffs essentially contend, it actually would further the State's interests in marriage and the strengthening of families to allow same-sex couples to

---

vidual persons. It does not develop this argument at any length, however, and proceeds to an in-depth argument that the classification is appropriate. At any rate, even if a statute must differentiate between "persons" as op-

posed to "couples," DOMA appears to differentiate between "persons" who want to marry someone of the opposite sex from "persons" who want to marry someone of the same sex.

raise families within the institution of marriage.

This argument does not recognize the key difference between how most opposite-sex couples become parents, through sexual intercourse, and how all same-sex couples must become parents, through adoption or assisted reproduction.[9] Becoming a parent by using "artificial" reproduction methods is frequently costly and time-consuming. Adopting children is much the same.[10] Those persons wanting to have children by assisted reproduction or adoption are, by necessity, heavily invested, financially and emotionally, in those processes. Those processes also require a great deal of foresight and planning. "Natural" procreation, on the other hand, may occur only between opposite-sex couples and with no foresight or planning. All that is required is one instance of sexual intercourse with a man for a woman to become pregnant.

What does the difference between "natural" reproduction on the one hand and assisted reproduction and adoption on the other mean for constitutional purposes? It means that it impacts the State of Indiana's clear interest in seeing that children are raised in stable environments. Those persons who have invested the significant time, effort, and expense associated with assisted reproduction or adoption may be seen as very likely to be able to provide such an environment, with or without the "protections" of marriage, because of the high level of financial and emotional commitment exerted in conceiving or adopting a child or children in the first place.

By contrast, procreation by "natural" reproduction may occur without any thought for the future. The State, first of all, may legitimately create the institution of opposite-sex marriage, and all the benefits accruing to it, in order to encourage male-female couples to procreate within the legitimacy and stability of a state-sanctioned relationship and to discourage unplanned, out-of-wedlock births resulting from "casual" intercourse.[11] Second, even

---

**9.** It is possible, and indeed likely frequently happens, that a same-sex couple may raise a child or children that one or both members had earlier as a result of an opposite-sex relationship. The Plaintiffs focus on same-sex couples who have children by assisted reproduction and adoption. We do likewise, focusing on the inability of a same-sex couple to have a child together within the confines of their intimate relationship.

**10.** A female couple might be able to utilize the relatively simple and inexpensive method of straightforward artificial insemination of one of the partners from a sperm donor in order to have a child. Charlotte and Dawn Egler, however, used an in vitro fertilization ("IVF") method wherein Dawn's egg was fertilized by sperm from an anonymous donor, then implanted in Charlotte. The average cost of one IVF cycle in the United States, and it frequently takes multiple cycles in order to succeed, has been estimated at $12,400, which usually is not covered by health insurance. *See* American Society of

Reproductive Medicine, "Frequently Asked Questions About Infertility," *http://www.asrm.org/Patients/faqs.html* (last visited January 11, 2005). Current estimates of adoption costs range from zero, in some instances, to as much as $40,000 or more. *See* U.S. Department of Health and Human Services, Administration for Children and Families, "Costs of Adopting: A Factsheet for Families," *http://naic.acf.hhs.gov/pubs/s—cost/s—costs.pdf* (published June 2004).

**11.** We do not wish to denigrate the multitude of single parents or unmarried couples in society who have raised or are raising children successfully. Nevertheless, we cannot ignore the existence of studies and scholarly commentary indicating that the increase in out-of-wedlock births, and we are talking here specifically about children resulting from opposite-sex intercourse, has resulted in higher instances of physical and sexual child abuse, educational failure, and poverty, among other things. *See* Lynn D. Wardle, *"Multiply and Replenish": Considering Same–Sex Marriage*

where an opposite-sex couple enters into a marriage with no intention of having children, "accidents" do happen, or persons often change their minds about wanting to have children. The institution of marriage not only encourages opposite-sex couples to form a relatively stable environment [12] for the "natural" procreation of children in the first place, but it also encourages them to stay together and raise a child or children together if there is a "change in plans."

One of the State's key interests in supporting opposite-sex marriage is not necessarily to encourage and promote "natural" procreation across the board and at the expense of other forms of becoming parents, such as by adoption and assisted reproduction; rather, it encourages opposite-sex couples who, by definition, are the only type of couples that can reproduce on their own by engaging in sex with little or no contemplation of the consequences that might result, i.e. a child, to procreate responsibly. The State recognized this during oral argument when it identified the protection of *unintended* children resulting from heterosexual intercourse as one of the key interests in opposite-sex marriage. The institution of opposite-sex marriage both encourages such couples to enter into a stable relationship before having chil-

dren and to remain in such a relationship if children arrive during the marriage unexpectedly. The recognition of same-sex marriage would not further this interest in heterosexual "responsible procreation." [13] Therefore, the legislative classification of extending marriage benefits to opposite-sex couples but not same-sex couples is reasonably related to a clearly identifiable, inherent characteristic that distinguishes the two classes: the ability or inability to procreate by "natural" means.

Justice Cordy of the Supreme Judicial Court of Massachusetts has aptly described the connection between marriage, heterosexual reproduction, and childrearing in a way that emphasizes our point regarding "responsible procreation" and the fundamental difference between same-sex and opposite-sex couples:

> Paramount among its many important functions, the institution of marriage has systematically provided for the regulation of heterosexual behavior, brought order to the resulting procreation, and ensured a stable family structure in which children will be reared, educated, and socialized. Admittedly, heterosexual intercourse, procreation, and child care are not necessarily conjoined . . ., but an orderly society requires some

---

*in Light of State Interests in Marital Procreation*, 24 Harv. J.L. & Pub. Pol'y 771, 788–90 (2001).

12. We refer to the *"relatively* stable environment" of government-sanctioned marriage because we acknowledge the frequency of divorce in modern society. This frequency, however, does not render the State's attempt to encourage long-term commitments by opposite-sex couples irrational or unreasonable.

13. We are using the term "responsible procreation" to mean the procreation and raising of children by persons who have contemplated, and are well-suited for, the required commitment and challenges of child-rearing. This is a slight re-wording of Professor War-

dle's definition of the term. *See* Wardle, 24 Harv. J.L. & Pub. Pol'y at 782 n. 24 (defining "responsible procreation" as "procreation by parents who share a clear, firm, permanent commitment to each other and to the protection and care of children who are the offspring of their procreative union."). Again, same-sex or opposite-sex couples who adopt or use assisted reproduction technologies may be presumed to have, by necessity, thoroughly contemplated such challenges before investing the time, money, and effort needed to adopt or use reproductive technology. Opposite-sex couples who can reproduce "naturally" need not, and often do not, engage in such contemplation before having intercourse.

mechanism for coping with the fact that sexual intercourse commonly results in pregnancy and childbirth. The institution of marriage is that mechanism. . . . The institution of marriage provides the important legal and normative link between heterosexual intercourse and procreation on the one hand and family responsibilities on the other. The partners in a marriage are expected to engage in exclusive sexual relations, with children the probable result and paternity presumed. Whereas the relationship between mother and child is demonstratively and predictably created and recognizable through the biological process of pregnancy and childbirth, there is no corresponding process for creating a relationship between father and child. Similarly, aside from an act of heterosexual intercourse nine months prior to childbirth, there is no process for creating a relationship between a man and a woman as the parents of a particular child. The institution of marriage fills this void by formally binding the husband-father to his wife and child, and imposing on him the responsibilities of fatherhood. The alternative, a society without the institution of marriage, in which heterosexual intercourse, procreation, and child care are largely disconnected processes, would be chaotic.

*Goodridge v. Department of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941, 995–96 (2003) (Cordy, J., dissenting) (internal citations omitted).

More specific to Indiana and the question arising under the Indiana Constitution, our supreme court made similar observations regarding opposite-sex marriage long before the current debate regarding same-sex marriage erupted:

Marriage is the basic unit of our society. Through the institution of marriage, biological drives are directed into channels of socially accepted activity; it encourages the exercise of intimate affections on a most personal basis; children are theoretically provided with a stable environment; a means is provided by which such children might be reared and educated; individual initiative and self reliance are nurtured; family continuity from generation to generation is established.

*O'Connor v. O'Connor,* 253 Ind. 295, 310, 253 N.E.2d 250, 258 (1969). Members of a same-sex couple who wish to have a child, on the other hand, have already demonstrated their commitment to child-rearing, by virtue of the difficulty of obtaining a child through adoption or assisted reproduction, without the State necessarily having to encourage that commitment through the institution of marriage. Conversely, the "casual" intimate acts of a same-sex couple will never result in a child, but those of an opposite-sex couple can and frequently do.

Thus, although we accept that there are a growing number of studies indicating that same-sex couples are at least as successful at raising children as opposite-sex couples, such studies are irrelevant to the question of whether the Indiana Constitution requires that same-sex couples be allowed to marry. Additionally, it is quintessentially a task for the legislature to consider the weight to be assigned to these various studies, especially in light of the existence of some criticism of them and the relative novelty of the same-sex family structure, in deciding whether civil marriage benefits should be extended to same-sex couples. *See, e.g., Goodridge,* 798 N.E.2d at 979–80 (Sosman, J., dissenting).

We also do not need to address whether the *only* purpose of civil marriage is the State's interest in encouraging opposite-sex couples to procreate and raise children responsibly. We agree and acknowledge

that modern society attaches importance to the concept of marriage beyond procreation and establishing a stable environment for the raising of children. Nonetheless, it would also be improper to ignore that procreation and the raising of children is, and has been for a long time, recognized as one of the key purposes of marriage that is very important to many couples entering that institution, even if it is not the only purpose. We reiterate that *Collins* requires only that the disparate treatment accorded by legislation, not its purposes, be reasonably related to the inherent characteristics that distinguish the unequally treated classes. *Dvorak,* 796 N.E.2d at 239. We may not inquire into the legislative motives prompting the classification at issue in this case to divine whether the legislature's true purpose was to discriminate against homosexual couples. *See Collins,* 644 N.E.2d at 80 (quoting *Chaffin v. Nicosia,* 261 Ind. 698, 701, 310 N.E.2d 867, 869 (1974)).

The Plaintiffs also argue extensively that it is irrational to justify opposite-sex only marriage on procreative grounds because there is no requirement that couples wishing to marry prove their fertility or willingness to procreate, and furthermore even definitively sterile persons, such as elderly women, are allowed to marry. This is an overbreadth argument—it essentially posits that the State is required to more carefully draw lines concerning who may marry if it truly has an interest in promoting "responsible procreation" by opposite-sex couples, by excluding opposite-sex couples from marriage if they cannot, or will not, procreate.

█ A reasonable legislative classification is not to be condemned "merely because it is not framed with such mathematical nicety as to include all within the reason of the classification and to exclude all others." *Collins,* 644 N.E.2d at 80

(quoting *Cincinnati, Hamilton & Dayton Ry. Co. v. McCullom,* 183 Ind. 556, 561, 109 N.E. 206, 208 (1915)). There was a rational basis for the legislature to draw the line between opposite-sex couples, who as a generic group are biologically capable of reproducing, and same-sex couples, who are not. This is true, regardless of whether there are some opposite-sex couples that wish to marry but one or both partners are physically incapable of reproducing.

We do not agree with some well-known opinions from other jurisdictions, most notably Vermont and Massachusetts, that the Plaintiffs have asked us to consider. We will briefly discuss these decisions because the resolution of a question arising under the Indiana Constitution may be guided by decisions from other states addressing similar questions under their constitutions. *See City of Indianapolis v. Wright,* 267 Ind. 471, 476, 371 N.E.2d 1298, 1300 (1978). First, in *Baker v. State,* 170 Vt. 194, 744 A.2d 864 (1999), the Vermont Supreme Court held that the "Common Benefits Clause" of the Vermont Constitution, which is the rough equivalent of the Indiana Constitution's Equal Privileges and Immunities Clause, required the State of Vermont to offer legal benefits identical to those arising under marriage to same-sex couples.

We are not persuaded to follow *Baker* for several reasons. First, the relief sought by the Plaintiffs in this case is the issuance of actual marriage licenses, not the creation of an institution parallel to marriage such as civil unions. At oral argument, counsel for the Plaintiffs questioned the ability of this court to even dictate the creation of a civil union status. Not even the *Baker* majority, which otherwise crafted a very sweeping opinion, was prepared to dictate that same-sex couples in Vermont must be allowed to marry,

which is the relief the Plaintiffs are seeking here.[14]

Second, the test for analyzing legislative classifications under the "Common Benefits Clause" of the Vermont Constitution appears to be significantly less deferential to legislative discretion than is the *Collins* test for the Equal Privileges and Immunities Clause of the Indiana Constitution. The standard of review employed in *Baker* was whether the exclusion of same-sex couples from the benefits of marriage bore a "reasonable and just relation" to the governmental purpose of the exclusion. *Id.* at 878–79. The court also stated that there was a "core presumption" of inclusion, which seems to place the burden on the state to justify an exclusion, and that it would consider and balance the significance of the benefits and protections of the challenged law, whether the omission of one group from those benefits promotes the government's stated goals for the law, and whether the classification "is significantly underinclusive or overinclusive." *Id.* at 879. The balancing of competing interests, consideration of significant under or overinclusiveness, and especially the "core presumption" of inclusion referred to by the Vermont Supreme Court is much different than the two-part *Collins* Equal Privileges and Immunities test, which we again note has never resulted in a statute or ordinance being declared facially invalid.

Finally, we decline to follow the Vermont Supreme Court's analysis of the State of Vermont's procreation justification for opposite-sex marriage. The *Baker* majority opinion framed the question before it as whether the state's proffered interest in linking procreation and child rearing and promoting a permanent commitment between couples who have children "represent valid public interests that are reasonably furthered by the exclusion of same-sex couples from the benefits and protections that flow from the marital relation?" *Id.* at 881. In other words, the *Baker* court apparently was concerned with whether the recognition of same-sex unions would undermine the state's interests in encouraging "responsible procreation" by opposite-sex couples. However, we believe the proper analysis under the Indiana Constitution's Equal Privileges and Immunities Clause is whether recognizing same-sex marriage would further the State of Indiana's interest in "responsible procreation," not whether such recognition would harm that interest. The *Baker* court's emphasis on the fact that many same-sex couples are having children through adoption and assisted reproduction, which fact we do not dispute, fails to take into account the highly significant difference in the way in which opposite-sex couples and same-sex couples become parents. This difference, inherent to each class, forms the rational basis for distinguishing between opposite-sex and same-sex couples under the Indiana Constitution.

The second case is the *Goodridge* case from Massachusetts, which we have already mentioned and whose result we also decline to follow. First, we observe that although the majority purports to apply a rational basis test to Massachusetts' limitation of marriage to opposite-sex couples

---

**14.** The *Baker* decision led to the legislative creation of a status legally parallel to marriage for same-sex couples but with a different name, civil unions. *See* Vt. Stat. Ann. tit. 15, ch. 23. Also, the civil union status grants same-sex partners only rights and privileges arising under Vermont law, not federal law; additionally, it does not appear that any other state currently attaches any significance to a Vermont civil union. *See Rosengarten v. Downes*, 71 Conn.App. 372, 802 A.2d 170 (2002), *cert. granted*, 261 Conn. 936, 806 A.2d 1066 (2002), *appeal dismissed* (2002).

only, it frequently uses language suggesting that some stricter standard of review was being employed that was less deferential to legislative discretion. *See Goodridge*, 798 N.E.2d at 980–81 (Sosman, J., dissenting) (noting numerous references in the majority opinion to infringements on "fundamental rights," comparisons to interracial marriage bans that required strict scrutiny review, and characterizing the choice of whom to marry, regardless of gender, as "among the most basic of every individual's liberty and due process rights"). This analysis is inconsistent with the substantial deference courts must accord legislative classifications under Article 1, § 23 of the Indiana Constitution.

We additionally find that the *Goodridge* majority opinion is largely devoid of discussion of why the Commonwealth of Massachusetts might have chosen in the first place to extend marriage benefits to opposite-sex couples but not same-sex couples. It may well be, as the majority stated, that for many people "it is the exclusive and permanent commitment of the marriage partners to one another, not the begetting of children, that is the sine qua non of civil marriage." *Id.* at 961. However, that does not answer the question of why the government may choose to bestow benefits on one type of permanent commitment and not another. As we have identified, at least one of the reasons the government does so is to encourage "responsible procreation" by opposite-sex couples. Justice Cordy, in his dissent, correctly identifies this interest as being central to governmental recognition and support of opposite-sex marriage. *Id.* at 995–96 (Cordy, J., dissenting). The recognition of same-sex marriage would not further this interest.

We do concur with the result reached and analysis used in a decision by the Court of Appeals of Arizona. That court concluded that Arizona's version of DOMA, Ariz.Rev.Stat. § 25–101(C), did not violate state or federal guarantees of substantive due process and equal protection. *Standhardt v. Superior Court, County of Maricopa*, 206 Ariz. 276, 77 P.3d 451 (App. 2003), *rev. denied* (2004). That court conceded, "Children raised in families headed by a same-sex couple deserve and benefit from bilateral parenting within long-term, committed relationships just as much as children with married parents." *Id.* at 463. Nevertheless, this did not make the limitation of marriage to opposite-sex couples irrational, as the court explained:

> Indisputably, the only sexual relationship capable of producing children is one between a man and a woman. The State could reasonably decide that by encouraging opposite-sex couples to marry, thereby assuming legal and financial obligations, the children born from such relationships will have better opportunities to be nurtured and raised by two parents within long-term, committed relationships, which society has traditionally viewed as advantageous for children. Because same-sex couples cannot by themselves procreate, the State could also reasonably decide that sanctioning same-sex marriages would do little to advance the State's interest in ensuring responsible procreation within committed, long-term relationships.

*Id.* at 462–63. This analysis fully squares with our emphasis on whether allowing same-sex marriage would further the State's interest in encouraging "responsible procreation" by opposite-sex couples, not on whether that interest would be harmed.

Additionally, recent scholarly commentary from Canada supports our position in this case. Our neighbors to the north also have been struggling with the same-sex

marriage issue in recent years, leading to several decisions that have required recognition of such unions, including *EGALE Canada Inc. v. Canada,* [B.C. Ct.App. 2003] 225 D.L.R. (4th) 472, and *Halpern v. Toronto,* [Ont. Ct.App.2003] 225 D.L.R. (4th) 529. One commentator, however, has taken strong issue with the decisions in *EGALE* and *Halpern,* as well as in *Baker* and *Goodridge,* and their treatment of the same-sex marriage issue, concluding that these courts "did an unacceptable job with their performance of the very tasks that lie at the heart of judicial responsibility in virtually every case." Monte Neil Stewart, *Judicial Redefinition of Marriage,* 21 Can. J. Fam. L. 13, 132 (2004).

This commentator, in part, takes specific issue with the courts' treatment of the procreation argument in favor of opposite-sex-only marriage, focusing primarily on the *Goodridge* case. The article correctly notes:

> [A] central and probably preeminent purpose of the civil institution of marriage (its deep logic) is to regulate the *consequences* of man/woman intercourse, that is, to assure to the greatest extent practically possible adequate private welfare at child-birth and thereafter. The opinions simply avoid this point when they say that marriage law does not require an intent or ability to procreate to stay married; they miss the States' point that marriage's vital purpose in our societies is not to mandate man/woman procreation but to ameliorate its consequences.

*Id.* at 47 (emphasis in original). Furthermore, "the *only* form of human procreation is heterosexual and that will continue to be the case until humankind begins human cloning." *Id.* at 49 (emphasis in original). The article also acknowledges:

> [T]he nature of [assisted reproduction technology] assures that conception will be the result of deliberation, planning, preparation, and commitment, which in turn assures to a high degree all the same relative to provision of private welfare at birth and thereafter. Thus, deliberative procreation by [assisted reproduction technology], for those dependent on it, to a not inconsiderable extent performs to society's benefit the role that marriage was designed to fill for the far greater number engaged in passion-based procreation....

*Id.* at 50. This article is fully reflective of our position: opposite-sex marriage is recognized and supported by law in large part to encourage "responsible procreation" by opposite-sex couples, who are the only ones who can, in fact, procreate "by accident," while those couples, either opposite-sex or same-sex, who must rely on adoption or assisted reproduction technology to have children have already demonstrated a commitment to responsibility without it having to be artificially encouraged by the government.

The State of Indiana has a legitimate interest in encouraging opposite-sex couples to enter and remain in, as far as possible, the relatively stable institution of marriage for the sake of children who are frequently the natural result of sexual relations between a man and a woman. One commentator has put it succinctly as follows: "The public legal union of a man and woman is designed ... to protect the children that their sexual union (and that type of sexual union alone) regularly produces." Maggie Gallagher, *What is Marriage For? The Public Purposes of Marriage Law,* 62 La. L.Rev. 773, 782 (2002). Even accepting that many same-sex couples are successfully raising children in today's society, these couples are not at "risk" of having random and unexpected children by virtue of their ordinary sexual activities. Extending the benefits of civil marriage to

same-sex couples would not further the State's interest in "responsible procreation" by opposite-sex couples. The differentiation between opposite-sex and same-sex couples in Indiana marriage law is based on inherent differences reasonably and rationally distinguishing the two classes: the ability to procreate "naturally." Given the high degree of deference we accord to legislative classifications, the Plaintiffs have not established that this particular classification violates the Equal Privileges and Immunities Clause of the Indiana Constitution, Article 1, § 23.

## II. Article 1, § 1 Claim

The Plaintiffs' second argument is that DOMA's limitation of marriage to opposite-sex couples to the exclusion of same-sex couples materially burdens a "core value" protected by Article 1, § 1 of the Indiana Constitution. That provision states:

> WE DECLARE, That all people are created equal; that they are endowed by their CREATOR with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness; that all power is inherent in the people; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the people have, at all times, an indefeasible right to alter and reform their government.

Article 1, § 1 requires that the Plaintiffs cross several high hurdles. They have failed to do so.

First, the Plaintiffs must establish that Article 1, § 1 is capable of independent judicial enforcement. As the Plaintiffs ac-

knowledge, our supreme court recently reviewed cases from other states interpreting constitutional provisions parallel to Article 1, § 1 and concluded that as a general rule, such provisions had not been interpreted "to provide a sole basis for challenging legislation since the language is not so complete as to provide courts with a standard that could be routinely and uniformly applied." *Doe v. O'Connor*, 790 N.E.2d 985, 991 (Ind.2003). Ultimately, however, our supreme court concluded that it did not have to decide whether Article 1, § 1 created independently enforceable substantive rights. *Id.* The Plaintiffs assert that, in fact, some states have found their parallels to Article 1, § 1 to embody independently enforceable rights. It might be presumed, however, that even if the language in *Doe* was dicta, it is a good indicator of the court's current thinking regarding Article 1, § 1 and that it is inclined to hold that particular constitutional provision not to be judicially enforceable.

However, there are some examples of older supreme court cases that found Article 1, § 1, to be independently capable of judicial enforcement, the most recent of which is *Department of Financial Institutions v. Holt*, 231 Ind. 293, 108 N.E.2d 629 (1952). In that case, the court invalidated a statute limiting the amount that purchasers of retail installment contracts could agree to pay retail dealers because it was an impermissible exercise of the State's police power under Article 1, § 1. Consistent with *Holt*, other cases predating it and paralleling its result by applying Article 1, § 1 were also "economic rights" cases involving the regulation of businesses or economic transactions.[15] *See*

---

**15.** There is one exception to this pattern, and that is *Beebe v. State*, 6 Ind. 501 (1855), in which our supreme court found a right to possess alcohol. This case and others following it were later overruled during the Prohibition Era. *See Schmitt v. F.W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19 (1918).

*Kirtley v. State,* 227 Ind. 175, 84 N.E.2d 712 (1949) (invalidating statute forbidding resale of entertainment or sporting event tickets at anything other than face value); *Department of Ins. v. Schoonover,* 225 Ind. 187, 72 N.E.2d 747 (1947) (invalidating statute requiring certain insurance agents to work on commission, not salary); *State Bd. of Barber Examiners v. Cloud,* 220 Ind. 552, 44 N.E.2d 972 (1942) (invalidating regulations establishing minimum prices and hours of operation for barber shops); *Street v. Varney Elec. Supply Co.,* 160 Ind. 338, 66 N.E. 895 (1903) (invalidating minimum wage legislation for public works projects). There is a more recent case from this court that assumed Article 1, § 1 is capable of judicial enforcement, but it too concerned the State's police power to regulate lawful businesses. *See City of Indianapolis v. Clint's Wrecker Service, Inc.,* 440 N.E.2d 737 (Ind.Ct.App.1982).[16]

As the State points out, these cases seem much like *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), which recognized a right of "liberty of contract" and invalidated a statute regulating the numbers of hours an employee could work per week because it exceeded the proper scope of New York's police powers and violated the Fourteenth Amendment. *Lochner* and its economic "substantive due process" reasoning have long been rejected. *See McIntosh v. Melroe Co.,* 729 N.E.2d 972, 975 (Ind.2000). The Plaintiffs urge nonetheless that Article 1, § 1 can evolve to embrace and judicially enforce their right to state recognition of their desire to marry. However, we are not inclined to accept this argument, given the recent dicta in *Doe,* the fact that no statute has been invalidated under Article 1, § 1 for over fifty years, and that prior cases that did invalidate statutes under Article 1, § 1 did so using a now-discredited view of the scope of the government's police power to regulate businesses.[17]

Even if Article 1, § 1 is capable of independent judicial enforcement of a "core value" it purportedly contains, the Plaintiffs' next burden is to establish that their desire to marry each other and receive accompanying state benefits is such a value.[18] To the extent a "core value" under the Indiana Constitution is arguably the rough equivalent to a "fundamental right" under the federal or other state constitutions, most courts have not looked favorably upon finding a "fundamental right" to marry a person of the same sex. This includes courts that have ultimately found

**16.** In affirming an ordinance regulating the operation of wrecker services, this court did not apply the reasoning used in the earlier "economic rights" cases from our supreme court, but instead asked whether the challenged enactment bore a reasonable and substantial relation to promoting the health, peace, morals, education, good order, and welfare of the people. *See Clint's Wrecker Service,* 440 N.E.2d at 742. At oral argument, Plaintiffs' counsel asserted that this test is analogous to the "substantive" due course of law test under Article 1, § 12 of the Indiana Constitution, which we address in the next part of this opinion.

**17.** We are aware that another panel of this court recently held that Article 1, § 1 contains

an enforceable "core value" right to privacy, including a right to decide whether to terminate a pregnancy. *Clinic For Women, Inc. v. Brizzi,* 814 N.E.2d 1042, 1048–49 (Ind.Ct. App.2004). The decision stopped short of invalidating an abortion regulation statute, however, and instead remanded for further proceedings. *Id.* at 1052. Our supreme court is currently considering a petition to transfer in that case.

**18.** The Plaintiffs repeatedly refer to marriage and the right to choose one's spouse as a "core value" without clarifying that the issue before this court is whether the State can choose to bestow benefits upon one type of permanent commitment and not another.

in favor of requiring the government to extend marriage-like benefits to same-sex couples under an equal protection-type analysis.

For example, in *Baehr v. Lewin*, 74 Haw. 530, 852 P.2d 44, 56 (1993), the Hawaii Supreme Court held that a restriction of marriage to opposite-sex couples was subject to strict scrutiny under the Hawaii Constitution's equal protection guarantee, but nevertheless also readily concluded "that the federal construct of the fundamental right to marry—subsumed within the right to privacy implicitly protected by the United States Constitution—presently contemplates unions between men and women." This conclusion is difficult to disagree with, given the Minnesota Supreme Court's decision in *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971), that bans on same-sex marriage do not violate the Fourteenth Amendment and the binding effect of the United States Supreme Court's dismissal of the appeal from that decision for want of a substantial federal question. *Baker v. Nelson*, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). Additionally, as the Hawaii Supreme Court noted, the first United States Supreme Court case labeling marriage a "fundamental right" expressly stated, "Marriage *and procreation* are fundamental to the very existence and survival of the race." *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (emphasis added). This language linking marriage and procreation, particularly when combined with the fact that marriage was undoubtedly viewed as an opposite-sex institution in 1942, indicates that the Court "was obviously contemplating unions between men and women when it ruled that the right to marry was fundamental." *Baehr*, 852 P.2d at 56. Furthermore, the Hawaii court declined to find a fundamental right to same-sex marriage arising from the Hawaii constitution.

*Id.* at 57. *See also Baker*, 744 A.2d at 868 ("there is no doubt that the plain and ordinary meaning of 'marriage' is the union of one man and one woman as husband and wife."); *cf. also Goodridge*, 798 N.E.2d at 961 (declining to address whether limitation of marriage to opposite-sex couples impacted a "fundamental right" of same-sex couples).

■■■ As for the Indiana Constitution, what amounts to a constitutional "core value" is a judicial question that depends on the purpose for which a particular constitutional guarantee was adopted and the history of Indiana's constitutional scheme. *Price v. State*, 622 N.E.2d 954, 961 (Ind. 1993). In *Price*, the supreme court concluded that "political speech" was a "core value" embodied within Article 1, § 9 of the Indiana Constitution, which is its free speech provision. *Id.* at 963. As such, the State could not "materially burden" the exercise of that "core value." *Id.* at 963–64. The court noted at length the history of Article 1, § 9, the "populist, anti-government Jacksonian Democrats" who drafted the 1851 Constitution, and the importance at the time of popular participation in public affairs. *Id.* at 961–62. By contrast, the Plaintiffs must look to a constitutional provision of vague import and which does not mention marriage, while Article 1, § 9 is clearly concerned with speech generally. In fact, the Plaintiffs can point to no history surrounding the ratification of the 1851 Indiana Constitution indicating the drafters contemplated the right to marry the spouse of one's choice, let alone someone of the same sex, and receive accompanying governmental benefits to be a "core value."

■■■ The history that the Plaintiffs do point to concerning Article 1, § 1 is not helpful in finding the existence of a "core value" right to government-recognized marriage to any person of one's choosing.

The Plaintiffs quote a delegate at the 1850 Constitutional Convention who stated that Article 1, § 1 guaranteed "the right to walk abroad and look upon the brightness of the sun at noon-day[.]" *In re Matter of Lawrance,* 579 N.E.2d 32, 39 n. 3 (Ind. 1991) (quoting 1 Debates in Indiana Convention 968 (1850)). The Plaintiffs essentially wish to convert this statement, which seems to contemplate a lack of excessive governmental influence in private affairs, into public, state recognition of marriage to anyone of a person's choice as a constitutional "core value." We decline to do so. To the extent that Article 1, § 1, may contain some guarantee of minimal governmental interference in private affairs, the Plaintiffs have failed to convince us that it contemplates as a "core value" that the government must act affirmatively to extend the benefits of marriage to any particular couple. Conversely, the State of Indiana is not interfering in the private affairs of the Plaintiffs, or infringing upon "the opportunity to manage one's own life" envisioned by Article 1, § 1. *See Lawrance,* 579 N.E.2d at 39.[19] The Plaintiffs' intimate relationships are not illegal under the laws of this State and they enjoy extensive freedom to organize their personal affairs in a manner that suits them, which encompasses the freedom to create a family unit that includes children.

There are simply too many obstacles to the Plaintiffs' claim that Article 1, § 1 of the Indiana Constitution requires the State to extend to them the benefits associated with civil marriage. Our supreme court has recently indicated its current reluctance to find Article 1, § 1 to be judicially enforceable. When it has been so enforced in the past, the cases almost always concerned business or economic regulation

and used what appears to be now-discredited reasoning. Additionally, no statute or regulation has been invalidated under Article 1, § 1 for fifty years. Even assuming Article 1, § 1 is judicially enforceable, the Plaintiffs do not succeed in their argument that that provision contains a "core value" right to enter into government-sanctioned same-sex marriages that Indiana Code Section 31–11–1–1 materially burdens. This conclusion is consistent with both the history of Article 1, § 1, and courts in other jurisdictions that have declined to find a "fundamental right" to government-recognized same-sex marriage. The Plaintiffs' claim under Article 1, § 1 of the Indiana Constitution fails.

### III. Article 1, § 12 Claim

The Plaintiffs' final argument is that Indiana Code Section 31–11–1–1 violates Article 1, § 12 of the Indiana Constitution. That provision states: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

The Plaintiffs fail to develop a substantial argument in their briefs regarding this provision of the Indiana Constitution. They claim to rely upon the "strain" of Article 1, § 12 doctrine that has been identified as "analogous to federal substantive due process." *See McIntosh,* 729 N.E.2d at 976. "[I]n general this [substantive due course of law] doctrine imposes the requirement that legislation interfering with a right bear a rational relationship to a legitimate legislative goal, but does not preserve any particular remedy from legislative repeal." *Id.* As this language indicates, *McIntosh* specifically addressed

---

**19.** *Lawrance* cited Article 1, § 1 as a guideline in interpreting Indiana's Health Care Consent Act and did not address whether that constitutional provision is independently enforceable.

whether the legislature could enact a statute that deprived a person of a complete tort remedy for what would otherwise be a valid claim under common law. *Id.* at 979–80. The Plaintiffs fail to address how Article 1, § 12 and *McIntosh's* interpretation of it applies to this case, which concerns the State's definition of marriage and not a limitation on seeking redress in the courts for an injury.

 Nevertheless, even if Article 1, § 12 and "substantive" due course of law can be invoked in this case, legislation is valid under Article 1, § 12 if it is a rational means to achieve a legitimate legislative goal. *Id.* at 979. Additionally, the test for rationality under Article 1, § 12 is very similar to the requirement of a rational relationship for legislative classifications under Article 1, § 23. *Id.* at 980. We have already discussed at length in part I of this opinion the rationality of the legislature's decision to extend the benefits of civil marriage to opposite-sex couples but not same-sex couples. To reiterate and slightly re-word for Article 1, § 12 purposes, at least one legitimate legislative goal at issue here is to encourage heterosexual, opposite-sex couples to procreate responsibly and to have and raise children within a relatively stable, committed relationship, because of the innate fact that opposite-sex intercourse frequently results in unintended children while same-sex intercourse never will. Extending the benefits of civil marriage to opposite-sex couples furthers this goal; extending them to same-sex couples would not. Hence, Indiana's limitation of marriage to opposite-sex couples, pursuant to Indiana Code Section 31–11–1–1, does not violate Article 1, § 12 of the Indiana Constitution.

### Conclusion

What we decide today is that the Indiana Constitution does not require the governmental recognition of same-sex marriage, although the legislature is certainly free to grant such recognition or create a parallel institution under that document. Nevertheless, Indiana's DOMA, Indiana Code Section 31–11–1–1, does not violate Article 1, § 23 of the Indiana Constitution because opposite-sex marriage furthers the legitimate state interest in encouraging opposite-sex couples to procreate responsibly and have and raise children within a stable environment. Regardless of whether recognizing same-sex marriage would harm this interest, neither does it further it. The ability of opposite-sex couples to reproduce "naturally" and unexpectedly is the characteristic that rationally distinguishes them from same-sex couples. For much the same reasons, Section 31–11–1–1 also does not violate Article 1, § 12 of the Indiana Constitution. Finally, the Plaintiffs have failed to establish that they enjoy a "core value" right under Article 1, § 1 of the Indiana Constitution to marry each other and receive accompanying government benefits that is materially burdened by Section 31–11–1–1, even if Article 1, § 1 is currently capable of independent judicial enforcement in this context, which is doubtful. Section 31–11–1–1 does not run afoul of the Indiana Constitution and we conclude the trial court properly dismissed the Plaintiffs' complaint because they failed to state a claim upon which relief could be granted.

Affirmed.

KIRSCH, C.J., concurs in result.

FRIEDLANDER, J., concurs in result with opinion.

FRIEDLANDER, Judge, concurring in result.

The lead opinion sets forth a scholarly, thorough analysis that culminates in the conclusion the trial court correctly dis-

missed Appellants' complaint. I am constrained by binding precedent to concur in the result.

As the lead opinion amply reflects, the question before us is one of legality, not morality. Our conclusions on this question are thus not informed by our own personal views and opinions regarding the moral and societal issues implicated in the question before us, but instead—as is always the case—by our respective understandings of the law and legal precedent having a bearing on the matter at hand. In the final analysis, our votes on the question of whether the DOMA provision in question violates the Indiana Constitution turn upon only two criteria: the language of the constitution and the cases construing it. As one jurist considering this issue phrased it, "[h]owever much history, sociology, religious beliefs, personal experience or other considerations may inform our individual or collective deliberations, we must decide this case ... on the basis of our understanding of the law, and the law alone." *Baker v. Vermont,* 170 Vt. 194, 744 A.2d 864, 912 (Vt.1999) (Johnson, J., concurring in part and dissenting in part).

To be sure, the moral and societal questions presented here have far-reaching implications. Moreover, we are not writing on a blank slate. A number of our sister states either already have considered or are currently considering this question. Many have rendered opinions. Were all state constitutions the same, such cases might be of considerable persuasive value. All state constitutions are not the same, however. This case is unique, because it is the first and only one involving rights arising under the *Indiana* Constitution.

The moral aspects of this question are the same everywhere, regardless of the language of the particular state constitution in question. *Amici* is not far from the mark in observing that what is ultimately at stake in this lawsuit is "the nature and purpose of human distinctions and relations [.]" *Brief of Amici Curiae of the Hon. Sen. Kent Adams, et al.* at 19. The lead opinion and the parties to this appeal have done a thorough job of delineating the material benefits that, merely by virtue of attaining that status, devolve upon those who are legally married. Those benefits are both numerous and consequential. To deprive someone of the opportunity to attain legal marital status is no trifling matter, in that the prohibition has significant, real-life consequences. Viewed thus, there can be no doubt that the legislation in question implicates matters beyond debates about morality and historical societal preferences—it operates to deprive some citizens of the privileges granted to others, based solely upon membership in a class created by the legislation.

The lead opinion correctly concludes that I.C. § 31–11–1–1 clears the low bar of constitutionality set by *Collins v. Day,* 644 N.E.2d 72 (Ind.1994) for challenges arising under the equal protection clause of the Indiana Constitution. Pursuant to the *Collins* analysis, disparate treatment between classes is permissible so long as the treatment is reasonably related to the inherent characteristic that distinguishes the unequally treated classes. In this case, that means the prohibition against same-sex marriage is justifiable because the purpose of the DOMA legislation is to encourage responsible procreation, and same-sex couples cannot procreate through sexual intercourse. I must admit that I am somewhat troubled by this reasoning. Pursuant to this rationale, the State presumably could also prohibit sterile individuals or women past their child-bearing years from marrying. In fact, I would assume the State may place any restrictions on the right to marry that do not negatively impact the State's interest in encouraging

fertile, opposite-sex couples to marry. Yet, I.C. § 31–11–1–1's narrow focus is to prohibit marriage among only one subset of consenting adults that is incapable of conceiving in the traditional manner—same-sex couples. Such laser-like aim suggests to me that the real motivation behind I.C. § 31–11–1–1 might be discriminatory.

It is at this point in the analysis that one might delve into the social and moral aspects of the question. Our supreme court has held, however, that we should not "inquire into the legislative motives prompting such classifications." *Collins v. Day,* 644 N.E.2d at 80. Rather, The *Collins* formulation of the test of constitutionality under the Indiana's equal privileges clause is as follows:

> First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

*Id.* Justice Sullivan observed in *Humphreys v. Clinic for Women, Inc.,* 796 N.E.2d 247 (Ind.2003), that, reduced to its simplest terms, *Collins* requires that the class must be defined by a characteristic that is not arbitrary or impermissible and that the difference in legislative treatment must be reasonably related to the difference between the classes created in the legislation. Is I.C. § 31–11–1–1 reasonably related to the legislative objectives identified herein? Setting aside any questions about the moral and societal issues implicated in this case, I must conclude that it does.

My vote to concur in the result is premised in large part upon a recognition of the daunting burden that faced the Plaintiffs in their effort to have the DOMA legislation in question declared unconstitutional. The lead opinion capably sets out the nature of that task. I note especially that, unlike review conducted under the Equal Protection Clause of the United States Constitution, our scrutiny of the challenged legislation is not heightened under Indiana's version of that provision. The opposite is true, in fact. *Collins v. Day,* cited liberally in the lead opinion, guides our deliberations in this case.[20] I need not rehash that analysis. It suffices to say that the question *we* must decide, viewed through the *Collins* prism, is different than the one the Plaintiffs seek to place before us. The question Plaintiffs wish us to ponder is whether civil marriage ought to be an option available to same-sex couples in Indiana. *Collins* simply will not permit us to tackle that issue. Rather, we are limited under the *Collins* approach to considering whether there is a rational relationship between, on one hand, encouraging the goal of responsible procreation and, on the other, legislation that limits marriage to opposite-sex couples. Because same-sex couples cannot procreate as a result of physical union, they are not implicated in the question of whether a marriage between biological parents is good for the children, and consequently good for society. Thus, the ultimate question, as initially presented by the Plaintiffs, is a distant cousin of what that question

---

**20.** Although written only ten years ago, *Collins* was decided before this issue and its ramifications came to the fore nationally. In any event, we leave it to our supreme court to decide whether the significant evolution of the law in that specific area warrants revisiting the issue.

becomes after it has been distilled by *Collins v. Day*, viz., "may the State prohibit same-sex marriage" becomes, "will same-sex marriage promote, among other things, responsible procreation". Clearly, it would not.[21]

As a result, the question posed by the appellants must be resolved in a different arena, i.e., by the General Assembly and the people of this State. Unconstrained by the low bar set by the equal protection clause of the Indiana Constitution, *they* must identify and consider the societal implications and moral imperatives involved and determine whether the prohibition is justifiable on those grounds. Focusing only upon the narrow legal question before us, I must agree with my colleagues that the DOMA provision at issue does not violate the equal protection clause of the Indiana Constitution.

---

**21.** I stress here that "responsible procreation," as it is used in this narrowly focused constitutional analysis, refers only to the capability to reproduce biologically as a result of sexual intercourse between the parties in question. More specifically, it does *not* refer to the ability to parent a child. This court has observed more than once that persons involved in same-sex relationships can be nurturing and effective parents, and in recognition of that fact it may be in the best interest of a child to permit such individuals or couples to fill that role in the child's life. *See In re Adoption of K.S.P.*, 804 N.E.2d 1253 (Ind. Ct.App.2004) and *In re Adoption of M.M.G.C.*, 785 N.E.2d 267 (Ind.Ct.App.2003).